**In re Bruce YOUNG and Nancy Young, Debtors.**

**Julia A. CHRISTIANS, Trustee, Plaintiff**

**v.**

**CRYSTAL EVANGELICAL FREE CHURCH, Defendant.**

Bankruptcy No. 4–92–0871.

Adv. No. 4–92–157.

United States Bankruptcy Court, D. Minnesota.

Dec. 17, 1992.

Julia A. Christians, Lapp, Laurie, Libra, Abramson & Thomson, Chartered, Minneapolis, Minn., for plaintiff.

Tony Mannella, Babcock, Locher, Neilson & Mannella, Anoka, Minn., for defendant.

ROBERT J. KRESSEL, Chief Judge.

This adversary proceeding came on for hearing on October 7, 1992, on the parties' cross-motions for summary judgment. Julia A. Christians, the plaintiff, appeared *in propria persona* and F. Anthony Mannella appeared on behalf of the defendant. This court has jurisdiction pursuant to 28 U.S.C. §§ 1134 and 157(a) and Local Rule 201. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(H).

### UNDISPUTED FACTS

The parties have stipulated to certain facts for purposes of this motion. On Feb-

ruary 3, 1992, Bruce Young and Nancy Young filed a joint chapter 7 petition. The plaintiff is the trustee in their case. In the year immediately preceding the debtors' filing, the debtors made contributions to Crystal Evangelical Free Church. These contributions totaled $13,450 and were made while the debtors were insolvent.[1]

The debtors were active church members. As a supplement to their tithing, the debtors held numerous positions in the church and had served as officers of the day. The debtors regularly attended church services, actively participated in the church's programs and were welcomed on the premises at any time. These accommodations where available to the debtors whether they financially supported the church or not. At no time did the church require the debtors to pay any membership or attendance fee. However, the church does teach that people should offer regular contributions to the church. The debtors respected those teachings and made several purely voluntary contributions. However, the debtors did not receive money or tangible property in exchange for their contributions.

The plaintiff brought this adversary proceeding seeking to avoid the contributions pursuant to 11 U.S.C. § 548(a)(2) and recover them pursuant to 11 U.S.C. § 550(a). The plaintiff and the defendant both moved for summary judgment.

### ISSUE

The issue is whether contributions, made by a insolvent debtor to their church during the year preceding the filing of a chapter 7 petition, are avoidable under § 548(a)(2)[2]? I conclude that they are.

### DISCUSSION

#### I.

*The Standard For Summary Judgment*[3]

Summary judgment plays a very important role allowing the judge to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes to Rule 56. The importance of summary judgment cannot be overemphasized. Indeed, "[s]ummary judgment ... is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986) (quoting Rule 1 of the Federal Rules of Civil Procedure). "The motion for summary judgment can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those cases that really do raise genuine issues of material fact." *City of Mt. Pleasant, Iowa v. Associated Elec. Co-Op., Inc.,* 838 F.2d 268, 273 (8th Cir.1988); *see Catrett v. Johns–Manville Sales Corp.,* 756 F.2d 181, 189–90 (D.C.Cir. 1985) (Bork, J., dissenting).[4]

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on

---

1. The defendant stipulated to the debtors' insolvency for purposes of this motion only.

2. § 548 is entitled "Fraudulent Transfers and Obligations." The implication is unfortunate. While § 548(a)(1) specifically deals with transfers that are fraudulent, fraud is not a requirement for avoidability under § 548(a)(2).

3. *See generally,* William W. Schwarzer, Allan Hirsch, David J. Barrans, *The Analysis and Decision of Summary Judgment Motions; A Monograph on Rule 56 of the Federal Rules of Civil*

*Procedure,* 139 F.R.D. 441 (1992); George Loewenstien, *Second Thoughts about Summary Judgment,* 100 Yale L.J. 73 (1990); Louis, *Federal Summary Judgment Doctrine: A Critical Analysis,* 83 Yale L.J. 745 (1974); Currie, *Thoughts on Directed Verdicts and Summary Judgment,* 45 U.Chi.L.Rev. 72 (1977).

4. Judge Bork's comments were later adopted by the United States Supreme Court. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).[5] "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

## A. *The Burdens*

### 1. *The Moving Party*

Initially, the burden is on the party seeking summary judgment. It is the moving party's job to inform the court of the basis for the motion, and identify those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Simply stated, the moving party must show the court that there is an absence of evidence to substantiate the non-moving party's case. *Id.* at 325, 106 S.Ct. at 2554. To that end, the movant discharges its burden by asserting that the record does not contain a triable issue and identifying that part of the record which supports the moving party's assertion. *See Id.* at 323, 106 S.Ct. at 2552; *City of Mt. Pleasant*, 838 F.2d at 273.

### 2. *The Non-moving Party*

Once the movant has made its showing, the burden of production shifts to the non-moving party. The non-moving party must "go beyond the pleadings and by [its] ... own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,'" establish that there is specific and genuine issues of material fact

warranting a trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(c)). The non-moving party cannot cast some metaphysical doubt on the moving party's assertion. *Matsushita Elec. Indust. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). The non-moving party must present specific significant probative evidence supporting its case, *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990) sufficient enough "to require a ... judge to resolve the parties' differing versions of the truth at trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–89, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). Any affidavits must "be made on *personal* knowledge, must set forth such facts as would be admissible in evidence, and shall affirmatively show that the affiant is competent to testify to the matters stated therein." Fed.R.Civ.P. 56(e) (emphasis added). If, however, the evidence tendered is "merely colorable," or is "not significantly probative," the non-moving party has not carried its burden and the court must grant summary judgment to the moving party. *Id.* 477 U.S. at 249–50, 106 S.Ct. at 2511.

Here, however, the parties have stipulated to all the genuine issues of material fact and have not proffered any additional evidence. Accordingly, judgment may be entered as a matter of law.

## II.

### *Church Contributions as Avoidable Transfers*

The trustee asserts that the contributions to the church were avoidable transfers within 11 U.S.C. § 548(a)(2). Section 548, in relevant part, provides:

Fraudulent transfers and obligations.

(a) The trustee may avoid any transfer of an interest of the debtor in property ... that was made ... on or within one

---

5. Pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure, "Rule 56 Fed.R.Civ.P. applies in adversary proceeding[s]." *See* Fed. R.Bankr.P. 7056.

year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

. . . . .

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made ... or became insolvent as a result of such transfer

. . . . .

11 U.S.C. § 548. Thus, to avoid the transfer, the trustee must prove that:

(1) there was a transfer of the debtors' interest in property;

(2) made on or within a year preceding the filing of the petition;

(3) while the debtors were insolvent; and

(4) the debtors received less than reasonably equivalent value in exchange for the transfer.

*First Nat'l Bank in Anoka v. Minnesota Utility Contracting, Inc. (In re Minnesota Utility Contracting, Inc.)*, 110 B.R. 414, 417 (D.Minn.1990) *aff'g* 101 B.R. 72 (Bankr. D.Minn.1989). The parties have stipulated to the first three elements. Thus these motions boil down to one question: Did the debtors receive reasonably equivalent value in exchange for their contributions? The question really has two parts.[6] First, did the debtors receive value from the church? Second, if the debtors did receive value was it in exchange for their contributions?

## A. *Did the Debtors Receive Value?*

The task of resolving the dispute over the meaning of "value" begins with the language of the statute itself. *Pennsylvania Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 557–58, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990) ("the fundamental canon [of] statutory interpretation begins with the language of the statute itself."); *U.S. v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). "[My] sole function ... is to enforce [the statute] according to its terms." *Id.*, 489 U.S. at 241, 109 S.Ct. at

1030 (citing *Caminetti v. U.S.*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)). Defining the terms of the statute, I must "presume that a legislature says in a statute what it means and means in a statute what it says ..." *Connecticut Nat'l Bank v. Germain*, — U.S. —, —, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992) giving effect to the Code's plain meaning. *See, e.g., Patterson v. Shumate*, — U.S. —, — – —, 112 S.Ct. 2242, 2248–51, 119 L.Ed.2d 519 (1992); *Germain*, — U.S. at — – —, 112 S.Ct. at 1149– 50; *U.S. v. Nordic Village, Inc.*, — U.S. —, —, 112 S.Ct. 1011, 1015, 117 L.Ed.2d 181 (1992); *Union Bank v. Wolas*, — U.S. —, —, 112 S.Ct. 527, 530, 116 L.Ed.2d 514 (1991); *Board of Governors v. MCorp Financial, Inc.*, — U.S. —, — – —, 112 S.Ct. 459, 465–66, 116 L.Ed.2d 358 (1991).

Turning to section 548, "value" is

property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor.

11 U.S.C. § 548(d)(2)(A). The church did not satisfy or secure a present or antecedent debt of the debtors. Thus, the inquiry becomes: Did the debtors receive "property"?

### 1. *What is "Property?"*

While the Bankruptcy Code does not specifically define "property", various dictionaries do. For instance *Blacks Law Dictionary* defines property as

that which belongs exclusively to one ... every species of valuable right and interest. More specifically, ownership; the unrestricted and exclusive right to a thing; the right to dispose of a thing in every legal way, to possess it, to use it, and to exclude everyone else from interfering with it....

The word is also commonly used to denote everything which is the subject of ownership, corporeal or incorporeal, tangible or intangible, visible or invisible,

---

**6.** While there is obvious overlap, the two parts require independent analysis. This, unfortu-

nately is consistently ignored by virtually all the reported case law discussing section 548.

real or personal; everything that has an exchangeable value or which goes to make up wealth or estate.

*Black's Law Dictionary,* 1095 (5th ed. 1979). Parsing through the definition, one realizes that rights and things subject to ownership are property. Things are "whatever may be possessed or owned or be the object of a right...." *Webster's Third New International Dictionary,* 2376 (1981). Ownership is

... [t]he right of one or more persons to possess and use a thing to the exclusion of others. The right by which a thing belongs to some one in particular, to the exclusion of all other persons. The exclusive right of possession, enjoyment, and disposal....

*Black's Law Dictionary,* 997 (5th ed. 1979). Rights are established by the

power or privilege vested in a person by the law to demand action or forbearance at the hands of another: a legally enforceable claim against another that the other will do or will not do a given act ... the capacity to assert a legally recognized claim....

*Webster's Third New International Dictionary,* 1955 (1981).

The church asserts that the debtors received property in the form of religious services, theological programs and access to the premises. However, I find this argument unpersuasive. The debtors did not receive legal or equitable rights nor did they obtain any ownership interest from their contributions.

The debtors did not receive an ownership interest in the church or anything else by making their contributions. It is hard to imagine, at least in a mortal sense, that religious services and the like, can be possessed, owned or enjoyed to the exclusion of others. Indeed, the church traditionally is a place shared by all and where all are welcome. In fact, at one time the church was the center of the community tantamount to a town hall. That being the case, the debtors could not have received an ownership interest in anything from their contributions.

### 2. Can Executory Promises Be "Property?"

 Nor did the debtors receive any legal or equitable right to the services [7] the church provided. Since the middle of sixteenth century, executory promises have given rise to legal and or equitable rights. *See* Clinton W. Francis, *The Structure of Judicial Administration and the Development of Contract Law in Seventeenth–Century England,* 83 Colum.L.Rev. 35, 102 (1983) (citing *Rogers v. Snow, Danlison,* 123 Eng.Rep. 301 (C.P.1572)). Executory promises are bargained for exchanges in which one party owes, in a contractual sense, performance to another in the future. If either party fails to perform, a breach may be declared and the innocent party may assert legal or equitable rights. These rights arising under executory promises yield "value." [8] *Schlecht v. Schlecht,*

---

**7.** While not receiving property, the debtors, before and after making their contributions, did receive services. Services are "act[s] done for the benefit ... of another." *Webster's Third New International Dictionary,* 2075 (1981). The debtors plainly benefited from acts performed by the church. The debtors enjoyed their association with the Church and regularly attended church services and functions. Attending these services and functions, the debtors were comforted by the theologians unreserved advice, teachings, warmth and gospel. This spiritual comfort, I suspect, is what the debtors sought and what the church offered through its actions. Simply, the church acted, whether directly or indirectly, for the benefit of the debtors who received services. This, however, does not answer the question of whether the debtors had a *right* to such services.

**8.** While there are numerous cases opining that the Code's definition of value leaves "no room for a mere executory promise from the transferee as constituting that value", those cases are, in my opinion, incorrectly decided. Indeed, many of the cases rest on the Uniform Fraudulent Conveyance Act which has been subsequently modified. Those modifications are found in the Uniform Fraudulent Transfers Act which specifically provides that executory promises are "value." *See* Uniform Fraudulent Transfers Act § 3, 7A U.L.A. 651–52 (1992) comment 4. Moreover, some courts are plainly confused. A good example of this confusion is *Gray v. Snyder (In re Gray),* 704 F.2d 709 (4th Cir.1983). The *Gray* court cites *Collier on Bankruptcy* for the proposition that reasonably equivalent value under § 548 excludes future consideration, at least to the extent not actually performed. *Id.* at 711.

168 Minn. 168, 209 N.W. 883, 886 (1926) (assignment of interest in a contract in exchange for labor and materials to be furnished in the future was for value); *Freitag v. The Strand of Atlantic City*, 205 F.2d 778, 784 (3rd Cir.1953) (executory promises may be very valuable); *Hummel v. Cernocky*, 161 F.2d 685, 686 (7th Cir. 1947) (transfer of property to son who took over the mortgage was for value); *Chagnon Lumber Co. v. DeMulder*, 121 N.H. 173, 427 A.2d 48, 50 (1981) (citing *Osgood v. Insurance Co.*, 93 N.H. 160, 37 A.2d 12, 13 (1944)) (conveyance by husband of his interest in house in exchange for wife's promise to obtain second mortgage loan and use money to satisfy husband's debts was for value); *In re Fair*, 142 B.R. 628, 631 (Bankr.E.D.N.Y.1992) (transfer benefitting daughter and wife as part of a bargained for separation agreement and divorce whereby ex-wife agreed to forego any claim for maintenance in return for the conveyance, is a transfer for fair consideration); *In re Cottrill*, 118 B.R. 535, 537 (Bankr.S.D.Ohio 1990) (transfer by debtor to increase retirement payments is a transfer for value); *see also Quinn v. Union Nat'l Bank*, 32 F.2d 762, 771 (8th Cir.1929) (executory promises are value if unconditionally performed in the future). *Cf. In re Tveten*, 402 N.W.2d 551, 556 (Minn.1987) (character of the property received is not considered when determining "value.").

In addition to the case law, the Code itself recognizes some executory promises as value. While not directly applicable, section 541 is telling of what Congress meant when it said "property." Foremost, Congress intended that property be defined broadly. H.R.Rep. No. 595, 95th Cong. 1st Sess. 367–368 (1977); S.Rep. 989, 95th

Cong., 2d Sess. 82–83 (1978) U.S.Code Cong. & Admin.News p. 5787. "Property" is all encompassing. *Id.* This broad and all encompassing definition clearly includes executory promises. The plain language of section 548 supports my point. As previously stated, executory promises give rise to rights which are themselves considered a "legal or equitable interest of the debtor in property." 11 U.S.C. § 541(a)(1). For example: If prior to bankruptcy, a debtor had paid in advance to have his lawn mowed, no one would doubt that the debtor had the "right" to have his lawn mowed and that right was property of the estate under § 541(a)(1).

This broad, all encompassing definition of property is reflected and carried over into section 548. That becomes apparent focusing on the operative language of the statute. The plain language of section 548(d)(2)(A) tells me that the whole world of property is value less one specific exception, the "unperformed promise to furnish support to the debtor or a relative of the debtor." 11 U.S.C. § 548(d)(2)(A). The negative implication of this specific exclusion is that "property" includes any other kind of enforceable executory promise. *See* 2 David E. Epstein, Steve H. Nickles, James J. White, *Bankruptcy*, § 6–49, p. 21 (1992). Any other reading of section 548(d)(2)(A) does not give credence to the Code's plain meaning.

Further support is found in the comments to section 3 of the Uniformed Fraudulent Transfer Act (UFTA).[9] Indeed, the drafters of the UFTA made it clear that value includes executory promises:

> [T]he Uniform Fraudulent Conveyance Act has been thought not to recognize

---

Then, one paragraph later the *Gray* court essentially finds that a transfer of debtor's interest in home in exchange for future alimony is value. *Id.* at 712. The court, however, mischaracterizes the alimony as a "present or antecedent debt." *Id.* Plainly, the obligation to pay alimony is an executory promise. This mischaracterization, as well as the court's determination, are just a sample of the confusion among courts over the issue of executory promises.

**9.** The Uniform Fraudulent Transfers Act is the successor to the Uniform Fraudulent Convey-

ance Act. One of the key changes in the UFTA was the discarding of the concept of "fair consideration" in favor of the Bankruptcy Codes "reasonably equivalent value" defining "value" as the Code does. *See* Uniform Fraudulent Transfers Act, 7A U.L.A. 651 comment 3; Minn. Stat. § 513.43 (1992) (adopting and codifying as state law the Uniform Fraudulent Transfers Act); *see generally,* Peter A. Alces & Luther M. Dorr, *A Critical Analysis of the New Uniform Fraudulent Transfer Act,* 1985 U.Ill.L.Rev. 527, 539–543 (1985).

that an unperformed promise could constitute fair consideration. Courts construing ... prior law nevertheless have *held unperformed promises to constitute value in a variety of circumstances....* On the other hand, a transfer for an unperformed promise by an individual to support a parent or other transferor has generally been held voidable as a fraud on creditors of the transferor. *This Act [defining "value"] adopts the view that [executory promises are value].*

Uniform Fraudulent Transfers Act § 3, 7A U.L.A. 651–52 (1992) comment 4 (emphasis added). Plainly, the drafters intended to include most executory promises within the definition of value. Thus, precedent, the Code and the UFTA leave but one conclusion; executory promises constitute value.

3. *Did the Church Make Any Executory Promises?*

■ In addition to yielding value, executory promises also share another common characteristic; consideration. E. Allan Farnsworth, *Farnsworth on Contracts* §§ 2.3–2.4 (1990) (citing *Restatement (Second) of Contracts* § 75; Arthur Corbin, *Contracts* § 143 (1963)); *see generally,* Clinton W. Francis, *The Structure of Judicial Administration and the Development of Contract Law in Seventeenth-Century England,* 83 Colum.L.Rev. 35, 102 (1983) (historical foundations of executory promises). Thus, in order for an executory promise to give rise to legal and equitable rights, it must be supported by consideration. Here, however, the church's performance of worship and other services was not supported by consideration. Foremost, the church's performance of worship was not implicitly or explicitly "promised" to the debtors. In fact, the debtors' contributions did not induce the church to perform in any way. There was no link between what the debtor gave or promised to give and the church's behavior. The church performed unsolicited and independent of the debtors' contributions and in no way did the church change it's position in

reliance on the debtors continuing to support the church. *See generally,* E. Allan Farnsworth, *Farnsworth on Contracts* §§ 2.6, 2.9 & 2.10 (1990) (discussing the bargain theory of consideration).

Moreover, the debtors made their contributions receiving unbargained for benefits; the privilege to participate in religious worship. While this worship may have yielded the feelings of association, comfort, affection, companionship and love, these subjectively emotional benefits cannot be bargained for. *See Walker v. Treadwell (In re Treadwell),* 699 F.2d 1050, 1051 (11th Cir.1983) (citation omitted); *In re Porter,* 37 B.R. 56, 60–61 (Bankr.E.D.Va.1984). Thus, any benefits received by the debtors were mere gratuities lacking consideration and deemed valueless. *Id.; see also In re Royal Coach Country, Inc.,* 125 B.R. 668, 673 (Bankr.M.D.Fla.1991); *In re Uhlmeyer,* 67 B.R. 977, 980 (Bankr.D.Ariz.1986); *In re Factory Tire Distribs., Inc.,* 64 B.R. 335, 339 (Bankr.W.D.Pa.1986).

■ Beyond there being no consideration for the exchange, the charitable contributions were not economically beneficial to the debtor. It is fundamental that the transfer be economically beneficial to the debtor's estate for it to yield "value." *Rubin v. Mfrs. Hanover Trust Co.,* 661 F.2d 979, 993 (2d Cir.1981); *Ransier v. Public Employees Retirement System (In re Cottrill),* 118 B.R. 535, 537 (Bankr. S.D.Ohio 1990) (under § 548(a)(2), it is necessary to show lack of an economic benefit); *Ohio Corrugating Company v. DPAC, Inc. (In re Ohio Corrugating Co.),* 91 B.R. 430, 436 (Bankr.N.D.Ohio 1988) (debtor must receive economic value); *Vadnais Lumber Supply, Inc. v. Byrne (In re Vadnais Lumber Supply, Inc.),* 100 B.R. 127, 136 (Bankr.D.Mass.1989) (unlike consideration, there must be some measurable economic benefit). The debtors' estate did not obtain any economic value from the church. First, it was the debtors individually and not their pre-petition financial estate or their post-petition bankruptcy estate that received any benefit.[10] Indeed,

10. Any benefit that the debtors may have received, however, was merely incidental. Rev.

both estates could not and did not participate in the religious worship. Second, any benefit received by anyone lacked tangible or recognizable economic benefit.[11] Instead, the debtors had the opportunity to participate in religious worship; an item without a marketable financial value or economic utility from a creditor's view. Strictly religious benefits are not economically valuable. *See Hernandez v. C.I.R.*, 490 U.S. 680, 690–95, 109 S.Ct. 2136, 2144–46, 104 L.Ed.2d 766, *reh'g denied*, 492 U.S. 933, 110 S.Ct. 16, 106 L.Ed.2d 630 (1989) (distinguishing contributions to Church of Scientology from other contributions to religious organizations for purpose of Tax Code § 170 deductibility); *Staples v. C.I.R.*, 821 F.2d 1324, 1326–27 (8th Cir.1987) *vacated*, 490 U.S. 1103, 109 S.Ct. 3271, 104 L.Ed.2d 1014 (1989) (Spiritual gain to an individual church member cannot be valued by any measure known in the secular realm.); *Neher v. C.I.R.*, 852 F.2d 848, 851–57 (1988) *vacated* 882 F.2d 217 (6th Cir. 1989); *Christiansen v. C.I.R.*, 843 F.2d 418, 420–21 (10th Cir.1988) *cert. denied*, 490 U.S. 1113, 109 S.Ct. 3174, 104 L.Ed.2d 1035 (1989).

### 4. *Can a Value Be Put on Church Services?*

There are other problems with treating church services as property. As previously discussed, executory promises give rise to rights which are enforceable in law and equity. Assuming the debtors' contributions gave rise to valuable enforceable executory promises, how am I or any other judge to enforce them. First, it is nearly impossible to assess damages compensating the debtors for their lost bargain; there is no quantifiable certainty to the calculation. Contributions are not mandatory and amounts are not prescribed; every member contributes a different amount. It is also highly probable that each of the members values their spiritual experience differently if the experience can be valued at all. *See Staples*, 821 F.2d at 1327 ("Spiritual gain to an individual church member cannot be valued by any measure known in the secular realm.") Simply, there is no objectively or subjectively reasonable way to put the plaintiff in as good a position as if the promise had been honored.[12]

In addition, enforcement of executory promises between the church and its members either by an award of damages or its alternative of specific performance, might raise First Amendment problems. Enforcement puts the court in the delicate position of not only differentiating between "religious" benefits and "secular" ones but also putting a value on those benefits. While I only raise this as a fear, this is the sort of inquiry which I believe is "fraught with the sort of entanglement that the Constitution forbids." *Lemon v. Kurtzman*, 403 U.S. 602, 620, 91 S.Ct. 2105, 2115, 29 L.Ed.2d 745 (1971); *see id.* at 621–22, 91 S.Ct. at 2115–16; *see generally Hernandez*, 490 U.S. at 693–99, 109 S.Ct. at 2146–48.[13] Thus, there being no way to enforce

Rul. 71–580, 1971–2 C.B. 235, 236 ("Religious observances of any faith are considered under the law of charity to be of spiritual benefit to the general public as well as to the members of the faith, with the private benefit to individual participants being merely incidental to the broader good that is served."). "The public benefit from religion remains and predominates regardless of whether church doctrines provide for traditional congregational worship or individual worship ... or whether donations are voluntary or fixed." *Staples v. C.I.R.*, 821 F.2d 1324, 1326 (8th Cir.1987) *vacated*, 490 U.S. 1103, 109 S.Ct. 3271, 104 L.Ed.2d 1014 (1989) (citing *Murdock v. Pennsylvania*, 319 U.S. 105, 111, 63 S.Ct. 870, 874, 87 L.Ed. 1292 (1943).

**11.** At best, the debtor received "psychic income." Psychic income recognizes that in some

sense, no one acts unless action is preferable to inaction and takes into consideration the emotional benefits such as public acclaim, reputation for righteousness or internal pleasure derived from economically unwise decisions.

**12.** It is fundamental that one of the main objectives contract remedies is to put the injured party in as good a position as that party would have been had the contract been performed. *See* E. Allan Farnsworth, *Farnsworth on Contracts*, § 12.1 at 147–48 (1990).

**13.** *See* footnote 17 *infra* and text; *see generally* Note, *Section 170, Tax Expenditures and the First Amendment: The Failure of Charitable Religious Contribution for the Return of a Religious Benefit*, 61 Temp.L.Q. 443 (1988) (discussing general constitutional problems associated with

or compensate the debtors for their contributions, I am left with one conclusion; charitable contributions cannot give rise to an enforceable executory promise.

## B. *Was Value Received In Exchange For Charitable Contributions?*

Even if the debtors received value, the question is whether that value was received "in exchange for" the contributions. *See* 11 U.S.C. § 548(a)(2). Here, however, no exchange took place. It is the church's policy to welcome all members to worship regardless of the size of any contribution if one is made at all. The church's offerings were in no way linked to the debtors' contributions. In no way was the worship bargained for as the contributions were purely voluntary driven only by the debtors' feelings of association and goodwill. The debtors' did not and would not have received anything more or less if they would have donated more or donated nothing. The same amount of heat, air conditioning, education and worship was available regardless of the debtors' contribution. The church neither explicitly nor implicitly bound itself to perform exclusively for the debtors or condition its performance on the debtors' contributions. The sermon is for the spiritual gratification of all in attendance, not just those who contribute money. The debtors participated as every other member and received what every other member received; everyone received nothing "in exchange for" their donations.[14]

The Internal Revenue Code further supports the conclusion that the debtors could not have received property in exchange for their contributions. Section 170 of the Internal Revenue Code permits taxpayers to deduct "charitable contributions." Specifically, a taxpayer may deduct a "contribution or gift to … [a religious organization] used exclusively for religious … purposes." 26 U.S.C. § 170(c)(4). Recently, the Supreme Court thoroughly analyzed

section 170 holding that payments made to a religious organization *in exchange* for quid pro quo do not qualify as charitable contributions.[15] *Hernandez*, 490 U.S. at 691, 109 S.Ct. at 2145. The Court further explained that any benefit to the taxpayer, even those claimed as "purely religious in nature" could give rise to disallowance of a claimed charitable contribution. *Id.* at 691–95, 109 S.Ct. at 2145–46. Simply, the debtor cannot receive both a § 170 tax deduction and § 548 property at the same time. Unwittingly, the church's argument calls into question the right of its members to deduct contributions made to the church.

## C. *The Cases.*

The church, going beyond the express language of the statute, cites *Ellenberg v. Chapel Hill Harvester Church, Inc. (In re Moses)*, 59 B.R. 815 (Bankr.N.D.Ga.1986). *Moses* stands for the proposition that church services constitute property within the meaning of section 548. *Id.* at 818. It is as if *Moses* had descended from Mount Sinai (or would it be Peachtree Street?) with another commandment: "THOU SHALT NOT AVOID RELIGIOUS CONTRIBUTIONS." However, in this instance *Moses* is trying to be more policymaker than lawgiver.

The *Moses* court held that "[a]lthough nothing was given to the Debtors in exchange for the tithes and offerings, this Court finds that the many services provided to the Debtors by the [church] constitute 'property' pursuant to § 548(d)(2)(A)." *Id.* at 818. This conclusion is puzzling and without textual support. The *Moses* court found that "property" was defined by *Black's Law Dictionary.* The *Moses* court quotes the definition. However, this definition is never used. Indeed, without explanation, analysis or the slightest attention to text, the *Moses* court holds that the tithes are property. *Id.* Adding to the problem,

section 170 deduction for contributions to religious organizations).

**14.** The discussion regarding consideration *supra* at 893 also applies here. Just as the church

services were not property because they were not supported by consideration, the debtors' contributions also lack consideration.

**15.** *See* consideration analysis *supra* at 893.

the *Moses* court also neglects to address a critical issue: was there an exchange? [16]

Reading between the lines of reasoning, it becomes apparent that the *Moses* court thought what it was doing was "right." While it is not a pleasant task to require a church to refund contributions, "[my] sole function is to enforce the statute according to its terms." *Ron Pair Enters., Inc.,* 489 U.S. at 241, 109 S.Ct. at 1030. Engaging in this important task, I must "presume that a legislature says in a statute what it means and means in a statute what it says." *Germain,* — U.S. at ——, 112 S.Ct. at 1149. After all, Congress is the primary public policymaking institution of our government. Absent Constitutional infirmities, when Congress speaks, its words must prevail. Clearly, the *Moses* court's interpretation is not the way Congress wrote the statue. When balancing the competing public policies of compensating creditors and leaving religious contributions inviolate, a policy in favor of contribution at the expense of creditors would be a defensible social decision. However, Congress has not made such a decision and it would be inappropriate for a court to substitute its policy decision for Congress'. Courts have no business bending the statute out of shape because they believe that Congress should or might have written the statute a different way.

The *Moses* court places heavy reliance on *Wilson v. Upreach Ministries (In re Missionary Baptist Found. of Am.),* 24 B.R. 973 (Bankr.N.D.Tex.1982). The *Missionary* court held that a corporation received reasonably equivalent value in exchange for charitable contributions to a church.

*Id.* at 979. Again, the court glosses over the definition of value and its derivations equating the receipt of the church's "good will" with intangible property. *Id.* Specifically, the *Missionary* court found that

> [t]he morale of the employees and the good will of all of those people with whom [the debtor] dealt was reasonably enhanced by the continuation of the charitable contributions. Whether it is called "good will" or whether some other term is applied ... reasonably equivalent value was received by the [debtor] in exchange for the challenged transfers.

*Id.* at 979. Again, while the decision may feel right, there is absolutely no textual support for such a conclusion. [17] While I am *not* thrilled about making a church return contributions, especially under a statute titled "fraudulent transfers," I cannot adopt what the church, the *Moses* and *Missionary* courts urge as the voice of Congress is loud; property is value, charitable contributions are not.

### III.

#### Conclusion

When Congress speaks as clearly as it has done here, the plain meaning of the legislation is conclusive, except in those "rare cases" in which the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters. *Ron Pair Enters., Inc.,* 489 U.S. at 242, 109 S.Ct. at 1031 (quoting *Griffin v. Oceanic Contractors, Inc.,* 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)). However, defining property as to not include the rendering of services does not contravene the intent of the drafters of the Code. Indeed, such an interpretation

---

**16.** *See* footnote 6 *supra* and text.

**17.** Beyond a finding of no textual support, I am troubled with the notion that it is the judges responsibility to calculate value of the services provided. Moreover, while the parties themselves have not raised First Amendment concerns, I believe they exist when entertaining the tasks the *Missionary* court would have me undertake. *See Hernandez v. C.I.R.,* 490 U.S. 680, 693–701, 109 S.Ct. 2136, 2146–50, 104 L.Ed.2d 766 (1989) *aff'g Hernandez v. C.I.R.,* 819 F.2d 1212 (1st Cir.1987). As the First Circuit stated:

> [I]magine, a case in which the government monitored church records in a an attempt to place a monetary value on the benefit of all church services, group programs, and pastoral counselling generally available to contributing members. Such a case would present not only the problem of determining value but also the problem of excessive entanglement in the affairs [of] a religious institution.

*Hernandez,* 819 F.2d at 1218, *aff'd Hernandez v. C.I.R.,* 490 U.S. 680, 109 S.Ct. 2136, 104 L.Ed.2d 766 (1989); *see also* footnote 13 *supra* and text.

does not conflict with any other section of the Code, the legislative history of section 548 or, for that matter, with any important state or federal interest. When Congress enacted the Code, it envisioned the expeditious and fair collection, liquidation and distribution of the debtors' *entire* chapter 7 estate. To that end, section 548 empowers the trustee to get back gratuitous transfers that have depleted the resources available to creditors. Here, the trustee has correctly asserted that power. The transfers fit squarely within section 548 and can be avoided. *See* 11 U.S.C. § 548(a).

The church has failed on all grounds to articulate any argument or policy reason why charitable contributions should not be avoided under section 548. The language being clear and in conformity with the intent of Congress, the plain meaning is conclusive.

THEREFORE, IT IS ORDERED:

1. The plaintiff's motion for summary judgment is granted;

2. The defendant's motion for summary judgment is denied;

3. The transfers by the debtors to the defendant between February 3, 1991 and February 3, 1992, totalling $13,450 are void; and

4. The plaintiff shall recover from the defendant the sum of $13,450 together with costs of $120 and interest as provided by law.

LET JUDGMENT BE ENTERED ACCORDINGLY.