```
                              _____

                              No. 93-2267

                              _____


In re: Bruce Young;                   *
In re: Nancy Young                    *
                                      *
--------------------                  *
                                      *
Julia A. Christians,                  *
                                      *
               Appellee,              *
                                      *
United States of America,             *
                                      *
               Intervenor,            *
                                      *
        v.                            *
                                      *
Crystal Evangelical Free              *
Church,                               *
                                      *
               Appellant.             *
                                      *
--------------------                  *
                                      *
Christian Legal Society; The          *
National Association of               *
Evangelicals; Americans United        *  Appeal from the United States
for Separation of Church and          *  District Court for the
State; Concerned Women for            *  District of Minnesota
America; The Baptist Joint            *
Committee on Public Affairs;          *
The Southern Baptist Convention;*
The General Conference of             *
Seventh-Day Adventists;               *
The Evangelical Lutheran Church       *
in America;                           *
                                      *
               Amici Curiae.          *
                                      *
United States Senator Orrin G.        *
Hatch; The Church of Jesus            *
Christ of Latter-Day Saints;          *
Catholic League for Religious         *
and Civil Rights; Traditional         *
Values Coalition; Worldwide           *
Church of God,                        *
                                      *
               Amici Curiae.          *
```

                  _____

        Submitted:  September 15, 1994

          Filed:  May 6, 1996
                  _____

Before McMILLIAN and MAGILL, Circuit Judges, and BOGUE,[*] District
    Judge.
                  _____


McMILLIAN, Circuit Judge.


The Crystal Evangelical Free Church (hereinafter the church) appeals from a final order entered in the District Court for the District of Minnesota affirming an order entered in the Bankruptcy Court for the District of Minnesota that required the church to turn over to trustee Julia A. Christians certain funds debtors Bruce and Nancy Young had contributed to the church as tithes during the year preceding the filing of their petition for bankruptcy. In re Young, 148 B.R. 886 (Bankr. D. Minn. 1992), aff'd, 152 B.R. 939 (D. Minn. 1993). For reversal, the church argues that the contributions were not avoidable under 11 U.S.C. § 548(a)(2) because the contributions were not made in exchange for less than "reasonably equivalent value." The church also argues that requiring it to turn over the contributions discriminates against religion and violates the free exercise clause of the first amendment. For the reasons discussed below, we reverse the order of the district court.


BACKGROUND FACTS


The facts are not disputed. The debtors are active members of the church. For several years, as part of their religious

_____

    *The Honorable Andrew W. Bogue, United States
    District Judge for the District of South Dakota,
    sitting by designation.

-2-

belief and practice, the debtors voluntarily contributed certain funds as tithes to the church; they did not receive money or tangible property in exchange for their contributions.  Tithing is a spiritual and financial practice.  Believers traditionally give a tithe, or tenth, of their income to a religious organization such as a church.  See Lev. 27:1, 30, 32 (New International Version) ("The Lord said to Moses . . . . A tithe of everything from the land, whether grain from the soil or fruit from the trees, belongs to the Lord; it is holy to the Lord . . . . The entire tithe of the herd and flock-- every tenth animal that passes under the shepherd's rod-- will be holy to the Lord.").  The church teaches that Christians should offer regular contributions to support the work and message of the church.  However, the church does not insist on a particular amount or require payment of membership or attendance fees.  Members and non-members are welcome at worship services and other church services whether they tithe or not.  It is not disputed that the debtors are sincere in their religious faith.

In February 1992 the debtors filed a joint Chapter 7 bankruptcy petition.  During the year preceding the filing of their Chapter 7 petition, and at a time when they were insolvent, they contributed a total of $13,450.00 to the church.  The trustee filed this adversary proceeding against the church in order to recover those contributions as "fraudulent

transfers" under 11 U.S.C. § 548(a)(2)(A).[1]  The parties filed cross-motions for summary

---

[1]11 U.S.C. § 548(a) provides in part:

(a)  The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily--
. . . .

(2)(A)  received less than a reasonably equivalent value in exchange for such transfer or obligation; and
. . . .

(B)(i)  was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation.

-4-

judgment.  In order to avoid transfers under 11 U.S.C. § 548(a)(2)(A), the trustee must prove that (1) there was a transfer of the debtors' interest in property (2) made on or within a year preceding the filing of the petition (3) while the debtors were insolvent (4) in exchange for which the debtors received less than reasonably equivalent value.  The parties stipulated to the existence of the first three factors; the only factor in dispute was whether the debtors received "reasonably equivalent value" "in exchange for" their contributions to the church.

DECISION OF THE BANKRUPTCY COURT

The bankruptcy court granted the trustee's motion for summary judgment and denied the church's motion.  The bankruptcy court held that the debtors' contributions to the church were avoidable transfers under § 548(a)(2)(A) because the debtors did not receive "reasonably equivalent value" "in exchange for" their contributions.  148 B.R. at 890-93.  The bankruptcy court concluded that "value" referred solely to economic value, that is, "property" in a physical or material sense, and that religious services, theological programs and access to the church's facilities did not meet this economic definition of value.  Id. at 891, 895-96 (rejecting In re Moses, 59 B.R. 815, 818 (Bankr. N.D. Ga. 1986) (Moses) (holding church services constitute property within meaning of § 548), and In re Missionary Baptist Foundation of America, 24 B.R. 973, 979 (Bankr. N.D. Tex. 1982) (Upreach) (holding good will constituted reasonably equivalent value in exchange for charitable contributions to church)).

The bankruptcy court also concluded that the contributions were not economically beneficial to the debtors. 148 B.R. at 893. In the bankruptcy court's view, any benefit was strictly religious and thus merely incidental and enjoyed by the debtors individually and not by either their pre-petition or post-petition estate. Id. at 893-94 & n.10. The bankruptcy court also noted that the judicial system cannot differentiate between "religious" benefits and "secular" benefits, much less put a value on those benefits, and that any value calculation would be "fraught with the sort of entanglement that the Constitution forbids," and that the debtors' contributions to the church were thus avoidable as fraudulent transfers under § 548(a)(2)(A). 148 B.R. at 893-96 & n.13, 896 & n.17 (noting potential excessive entanglement problems in having courts calculate value of religious services, even though parties did themselves did not raise first amendment concerns).

The bankruptcy court also determined that, even assuming the debtors received value, that value had not been received "in exchange for" their contributions because no exchange took place. Id. at 895-96. As noted by the bankruptcy court, the church made available worship services and religious programs to all members, including the debtors, without in any way linking those services to financial contributions. Id. at 894 (noting that debtors could not have received property in exchange for their contributions for purposes of § 548(a) and at the same time treated those contributions as charitable deductions under 26 U.S.C. § 170(c)(4)). See Hernandez v. Commissioner, 490 U.S. 680, 691 (1989) (quid pro quo is inconsistent with charitable contribution); United States v. American Bar Endowment, 477 U.S. 105, 118 (1986) ("The sine qua non of a charitable contribution is a transfer of money or property without adequate consideration."). The bankruptcy court declared the transfers void and ordered the trustee to recover from the church $13,450.00, plus interest and costs. The church appealed the decision of the bankruptcy court to the district court.

DECISION OF THE DISTRICT COURT

On appeal, the district court affirmed the bankruptcy court's statutory interpretation and analysis of § 548(a)(2)(A) and agreed that the debtors did not receive "reasonably equivalent value" for their contributions to the church. 152 B.R. at 948. The district court also found that neither the religious services nor the tax deductions for charitable contributions constituted reasonably equivalent value under § 548(a)(2)(A). Id. at 948-49. The district court agreed with the bankruptcy court's decision not to follow Upreach and Moses. In the district court's view, good will and church services are not the kind of "fairly concrete" benefits required to constitute reasonably equivalent value, and neither case addressed the "in exchange for" requirement. Id. at 950. The district court noted that church services and charitable deductions were not given "in exchange for" the debtors' contributions. Id. at 949-50. The district court also distinguished Moses from the present case on the ground that in Moses the church had required the contributions as a condition of the debtor's employment as a deacon. Id. at 950. In the present case the parties stipulated that the debtors were not required to contribute in order to attend church services or otherwise participate in church programs.

On appeal in the district court, the church argued for the first time that applying § 548(a) would violate the free exercise and establishment clause of the first amendment. The district court exercised its discretion to consider the constitutional arguments and rejected them. The district court first held that the church had standing to raise the constitutional rights of the debtors in addition to its own. Id. at 950-51 (debtors could not effectively assert their free exercise rights because they are not parties in this proceeding). The district court then applied Employment Division v. Smith, 494 U.S. 872 (1990) (Smith), and held that the church's free exercise claim failed on the merits because the Bankruptcy Code was a neutral law of general applicability

which has only an incidental effect on religion.  152 B.R. at 953-54.  The district court held in the alternative that, even if the pre-Smith free exercise test applied, "[t]he government's policy of allowing debtors to get a fresh start while at the same time treating creditors as fairly as possible qualifies as a compelling [governmental] interest."  Id. at 954.

The district court also held that § 548(a) did not unfairly discriminate against religious contributions, id. at 954, and that the debtors' "hybrid" right to free speech and free exercise was not impaired because limiting the amount an individual may contribute to a cause or organization only marginally restricts the contributor's ability to communicate that particular message.  Id.  The district court noted that §548(a)(2)(A) was narrowly drawn and content-neutral, protected an important governmental interest in maximizing the debtors' estate, and did not violate the doctrine of separation of church and state.  Id. at 954.

Finally, the district court held that § 548(a) did not violate the establishment clause.  Id. at 955.  The district court applied the Lemon v. Kurtzman, 403 U.S. 602 (1971), entanglement test and found that § 548 has a secular purpose, to maximize the size of the debtor's estate; its primary effect neither advances nor inhibits religion; and its enforcement does not threaten excessive entanglement between church and state.  152 B.R. at 955.  The district court agreed with the bankruptcy court that attempting to quantify the value received by the debtors in exchange for their contributions to the church could lead to exactly the sort of entanglement the Constitution forbids.  Id.  This appeal followed.
CERTIFICATION OF CONSTITUTIONAL QUESTION

On November 13, 1993, after the district court had filed its decision and while this appeal was pending, President Clinton signed the Religious Freedom Restoration Act (RFRA), 42 U.S.C.

§ 2000bb.[2]  For this reason, questions about the application of the RFRA (or its constitutionality) were not presented to the district court. Pursuant to the court's request, the parties filed supplemental briefs addressing the applicability of the RFRA.

While preparing for oral argument, this court recognized, albeit belatedly, that certification under 28 U.S.C. § 2403(a) was required because the appeal questioned the constitutionality of a provision of the bankruptcy code affecting the public interest and the United States was not a party.  Accordingly, we removed the case from the argument calendar and certified the appeal to the Attorney General and invited the United States to intervene in the appeal on the question of constitutionality of 11 U.S.C. § 548(a) if it so desired.  See 28 U.S.C. § 2403(a); Fed. R. App. P. 44; Fed. R. Civ. P. 24(c).  The parties had not requested the bankruptcy court, the district court or this court to notify the Attorney General, and the district court and the bankruptcy court had not realized that 28 U.S.C. § 2403 requires notification of the Attorney General whether or not it is requested by the parties.  Nonetheless, "[f]ailure to notify the Attorney General is not a jurisdictional defect, and belated notice satisfies any

---

[2]The Religious Freedom Restoration Act, 42 U.S.C. § 2000bb, provides in part:

(a)    IN GENERAL-- Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

(b)  EXCEPTION-- Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--

(1)   is in furtherance of a compelling governmental interest; and

(2)   is the least restrictive means of furthering that compelling governmental interest.

-9-

requirement." <u>Tonya K. v. Board of Education</u>, 847 F.2d 1243, 1247 (7th Cir. 1988) (citations omitted).  Certification has occurred even after judgment at the appellate level.  E.g., <u>Merrill v. Town of Addison</u>, 763 F.2d 80, 83 (2d Cir. 1985) (citing cases).  "The rule is designed to give the Executive Branch both the time to make its views known and the opportunity to intervene in order to take a direct appeal to the Supreme Court if the decision should be adverse to the statute's constitutionality."  <u>Tonya K. v. Board of Education</u>, 847 F.2d at 1247.  No practical purpose would have been served in remanding the case to the bankruptcy court or the district court for purposes of certification, and the belated certification did not prejudice or otherwise impair the ability of the United States to fully present its views on the question of the constitutionality of § 548(a).  <u>See</u> <u>Merrill v. Town of Addison</u>, 763 F.2d at 83.

Following certification, the United States decided to intervene in the case and filed a brief supporting the position of the trustee and defending the constitutionality of § 548(a)(2)(A) under both <u>Smith</u> and the RFRA.  Several amicus briefs were filed in support of the church's position.[3]  Oral arguments were held in September 1994.  However, immediately before oral argument, the United States ended its participation in the case as intervenor and withdrew its brief.  The decision of the United States to withdraw surprised the parties and the court, but counsel for the trustee was substituted for the United States at the last moment and ably presented oral argument.

---

[3]Amicus briefs were filed in support of the church on behalf of the Christian Legal Society, the National Association of Evangelicals, Americans United for Separation of Church and State, Concerned Women for America, the Baptist Joint Committee on Public Affairs, the Southern Baptist Convention, the General Conference of Seventh-Day Adventists, and the Evangelical Lutheran Church in America; the Church of Jesus Christ of Latter-Day Saints; and United States Senator Orrin G. Hatch.

STANDARD OF REVIEW

We review the grant of summary judgment de novo.  The question before the district court, and this court on appeal, is whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial burden of identifying "those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  Once the moving party has met this burden, the non-moving party cannot simply rest on the allegations in the pleadings; rather, the non-movant "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Although we view the facts in the light most favorable to the non-moving party, in order to defeat a motion for summary judgment, the non-movant cannot simply create a factual dispute; rather, there must be a genuine dispute over those facts that could actually affect the outcome of the lawsuit.

In the present case, there are no genuine issues of material fact in dispute because the parties stipulated to the relevant facts and because the issues raise only questions of law.

The church's principal argument on appeal is that requiring the church to return these contributions violates the free exercise clause of the first amendment.  The church relied on Smith in its main brief but also raised a RFRA compelling governmental interest argument in its supplemental brief.  The church also argues that the district court erred in applying 11 U.S.C. § 548 to these contributions and in finding that the debtors did not receive

-11-

"reasonably equivalent value" "in exchange" for their contributions to the church.  We will discuss the statutory arguments first.

"FRAUDULENT" TRANSFERS UNDER 11 U.S.C. § 548(a)(2)

The section of the bankruptcy code under which the trustee recovered the contributions at issue, 11 U.S.C. § 548, is captioned "fraudulent transfers and obligations."  As a preliminary matter, the church argues that this caption is not merely "unfortunate" but significant because the purpose of the section is to avoid transfers made with fraudulent intent or at least under circumstances under which a transfer may be considered fraudulent.  The church argues that the section was not drafted with bona fide charitable contributions in mind and that in the present case there is no question of fraudulent intent.  The church notes that the debtors did not change the frequency or amount or the recipient of their contributions in the face of their changing financial circumstances.

The term "fraudulent" in the caption of 11 U.S.C. § 548 is inapposite and, at least with respect to § 548(a)(2), can certainly be misleading.  In re Newman, 183 B.R. 239, 245 & n.9 (Bankr. D. Kan. 1995).  It may be, as the district court noted, that "describing the [debtors' contributions] as 'avoidable transfers' rather than 'fraudulent transfers' may be more appropriate because it lessens the [unwarranted] inference of culpability." 152 B.R. at 950.  Fraudulent intent is not required to recover transfers made within one year of the bankruptcy filing under § 548(a)(2).  Compare 11 U.S.C. § 548(a)(1) (under which fraudulent intent is required to avoid transfers).  Section § 548(a)(2) requires only "constructive fraud," not actual intent to defraud.  "A transfer is constructively fraudulent if an insolvent debtor transfers some of its property for less than reasonably equivalent value."  In re Newman, 183 B.R. at 245 n.9.  In the present case the trustee has not accused the debtors and the church of any improper conduct,

-12-

much less actual fraud.  What is important, however, is not the misleading caption but that the trustee was not required to prove actual fraud in order to recover the contributions under § 548(a)(2)(A).  We next consider the church's substantive statutory argument.

In order to find a fraudulent transfer, or, more accurately, an avoidable transfer, has occurred under 11 U.S.C. § 548(a)(2), the trustee must prove by a preponderance of the evidence that (1) there was a transfer of an interest of the debtor in property, (2) the transfer was made within one year before the date of the filing of the petition, (3) the debtor was insolvent on the date the transfer was made, and (4) the debtor received less than a reasonable equivalent value in exchange for the transfer.  152 B.R. at 945 (citations omitted).  In the present case the parties stipulated that the first three elements were satisfied, and the only issue was whether the debtors had received "reasonably equivalent value" "in exchange for" their contributions to the church.  Id.  As noted above, the district court concluded that the debtors' contributions were gratuitous transfers, id. at 948, and that religious or spiritual support did not constitute "reasonably equivalent value."  Id. at 949-50.  The district court also concluded that, even assuming the church services did constitute "reasonably equivalent value," in the present case the church's services had not been provided "in exchange for" the debtors' contributions because the parties stipulated that the church services were available regardless of whether or not they made any contributions.  Id.

On appeal the church argues the district court erroneously defined "value" to include only tangible property and ignored how the debtors valued what they received from the church.  The church argues that "value" includes indirect economic benefits and that the debtors received "value" in the form of tax deductions for charitable contributions, church membership and spiritual

-13-

counseling, and, more concretely, access to church facilities because contributions from the debtors and others helped pay for the church's operating expenses.  The church also argues that the district court erred in concluding that the contributions were not made "in exchange for" the indirect economic benefits the debtors received in the form of church services.  The church argues a nexus existed between the contributions and those benefits because the debtors made the contributions during the same time period they received the benefits.

Title 11 U.S.C. § 548(d)(2)(A) defines "value" as "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or the relative of the debtor."  In the present case it was undisputed that the church did not satisfy or secure a present or antecedent debt of the debtors; the only issue was whether the debtors received some sort of "property" or "property right," and therefore "value," from the church. The bankruptcy court decided that the debtors did not receive any economic benefit from the church services.  148 B.R. at 893-94.  The bankruptcy court noted that although the debtors received substantial spiritual comfort from the church services, id. at 891 n.7, the church services did not provide them, much less their pre-petition estates, with any "tangible or recognizable economic benefit," "marketable financial value or economic utility from a creditor's point of view."  Id. at 894.  We agree that the bankruptcy court over-emphasized the financial or economic considerations in defining "value" under § 548.  "[T]he requirement of economic benefit to the debtor does not demand consideration that replaces the transferred property with something else tangible or leviable that can be sold to satisfy the debtor's creditor's claims."  2 David G. Epstein, Bankruptcy § 6-49, at 23 (1992).

Unlike the bankruptcy court, however, the district court did not define "value" only in terms of tangible property or marketable

financial value.  The district court correctly examined "all aspects of the transaction and carefully measure[d] the value of all benefits and burdens to the debtor, direct or indirect," including "indirect economic benefits." 152 B.R. at 945.  The district court required only that the indirect economic benefits be "fairly concrete."  Id., citing In re Minnesota Utility Contracting, Inc., 110 B.R. 414, 420 (D. Minn. 1990) (MUC) (bank required corporation to grant bank a security interest in its assets to extend additional line of credit to a second corporation owned by same shareholders; indirect economic benefit to first corporation could be "reasonably equivalent value" as long as indirect economic benefit was "fairly concrete"; no evidence that first corporation received any indirect economic benefits).  What "fairly concrete" means is not clear.  However, the district court clearly did not define "property" in general, or "indirect economic benefit" in particular, only in terms of legal or equitable rights or ownership interest.  Compare 148 B.R. at 891 (bankruptcy court arguably limited "property" to legal or equitable rights and things subject to ownership) with id. at 893-94 (value requires transfer of economic benefit to debtor's estate); cf. In re Newman, 183 B.R. at 247 (noting that tithing does not give debtors enforceable property right, contract right or equitable right to attend or partake in services offered by church).

In any event, in the present case, whether the debtors received any economic benefit from the church services is beside the point.  Even

assuming that the debtors received "reasonably equivalent value,"[4] the stipulated facts in the present case

---

[4]Finding that the church services had some economic benefit and that the debtors made the contributions in exchange for those services would call into doubt treating those contributions as deductible charitable contributions. See Hernandez v. Commissioner, 490 U.S. 680, 690-91 (1989) (charitable contributions are only deductible if made without adequate consideration; payments made to a religious organization in exchange for a benefit to the taxpayer, even a "purely religious" benefit, do not qualify as charitable contributions).

For purposes of analysis, we have also assumed that the contributions and the church services were reasonably equivalent and thus need not take up the constitutionally suspect and difficult task of attempting to value the church services.

precluded any finding that the debtors made their contributions "in exchange for" the church services.  152 B.R. at 949; 148 B.R. at 893. Section 548 contemplates a quid pro quo.  In the present case the parties' stipulations are inconsistent with a quid pro quo.  The debtors stipulated that they made the contributions out of a sense of religious obligation and not in order to attend church (or receive a tax deduction).  The parties also stipulated that the church services were available to all regardless of whether any contributions were made. In other words, the debtors' contributions were purely voluntary and in no way linked to the availability of church services.  Similarly, the church conducted worship services and provided other services independent of the debtors' contributions.  Under the stipulated facts, there was no quid pro quo, no exchange of contributions for church services.[5]

Because the debtors did not receive the church services "in exchange for" their contributions, the contributions were avoidable

---

[5]In fact, as one would expect, given the religious context, the absence of any nexus between tithing and the availability of religious services is typical of the case law in this area. See, e.g., In re Tessier, 190 B.R. 396, 399 (Bankr. D. Mont. 1995) (church would welcome and fully accept debtors without or without tithing); In re Newman, 183 B.R. 239, 248 (Bankr. D. Kan. 1995) (noting that debtors would have tithed in same amount even if church reduced services and that church would have provided services to debtors even if they had reduced their tithe or not tithed at all); In re Lees, No. 94-10523-13, 1994 WESTLAW 871932, at *2 (Bankr. D. Mont. 1994) (no indication that debtors could no longer attend or would lose any privileges at church if reduced or eliminated tithing); In re Packham, 126 B.R. 603, 608 (Bankr. D. Utah 1991) (only speculation by debtors that the church would deny them a temple recommend if they failed to tithe). But cf. In re Moses, 59 B.R. 815, 818 (Bankr. N.D. Ga. 1986) (contributions required as condition of debtor's employment by the church as a deacon).

transfers and were recoverable by the trustee under 11 U.S.C. § 548(a)(2).


FREE EXERCISE OF RELIGION


Having concluded that the debtors' contributions were avoidable transfers and recoverable by the trustee under bankruptcy law, we turn now to the church's first amendment arguments.  The parties' arguments on the merits are related and, to a certain degree, repetitive.  Because we hold that requiring the church to return the debtors' contributions violates the RFRA, we do not reach the merits of the constitutional issues.


As noted above, even though the church did not raise any constitutional arguments in the bankruptcy court and raised them for the first time on appeal in the district court, the district court exercised its discretion to consider the constitutional arguments on appeal.  The trustee argues that this is not the kind of extraordinary case that warrants an exception to the general rule that a reviewing court should not consider issues raised for the first time on appeal.  E.g., United States Trustee v. Harris, 960 F.2d 74, 78 (8th Cir. 1992).  We hold that the district court did not abuse its discretion in considering the constitutional arguments raised by the church for the first time on appeal. The constitutional arguments raised by the church for the first time on appeal involved purely legal issues.  No additional evidence or argument would have affected the outcome of the case.  E.g., Universal Title Insurance Co. v. United States, 942 F.2d 1311, 1314-15 (8th Cir. 1991).


STANDING


The trustee also argues the church lacks standing to raise the free exercise rights of the debtors, who were not parties in the adversary proceeding in bankruptcy court or on appeal in the

-18-

district court (or on appeal in this court).  We hold that the church has standing to raise the free exercise rights of the debtors.  See In re Newman, 183 B.R. at 249.  This issue involves the concept of third-party standing.  Standing is a jurisdictional prerequisite, and in general parties must raise their own legal rights.  However, a litigant can raise the free exercise rights of a third party if the third party cannot effectively assert those rights.  McGowan v. Maryland, 366 U.S. 420, 430 (1961) (department store challenging Sunday closing law could not raise free exercise rights of patrons).  We agree with the district court that the debtors could not have effectively asserted their free exercise rights. The trustee, representing the debtors' estates, and the church were the parties in this adversary proceeding; the debtors were not.  As noted by the district court, there was no indication that the debtors were able to assert their free exercise rights in another forum.  In addition, the interests of the church and the debtors, who are members of the church, were sufficiently similar so that the church would be an effective representative of the debtors' free exercise rights.

RETROACTIVE APPLICATION OF RFRA

Although the RFRA was enacted after the district court's decision, the RFRA provides that it "applies to all Federal and State law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after November 16, 1993."  RFRA § 6(a), 42 U.S.C. § 2000bb-3(a).  The RFRA defines the term "government" broadly to include "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States, a State, or a subdivision of a State."  Id. § 5(1), 42 U.S.C. § 2000bb-2(1).  The bankruptcy code is federal law, the federal courts are a branch of the United States, and our decision in the present case would involve the implementation of federal bankruptcy law.  We and other circuits have held that the RFRA applies retroactively in other contexts.

E.g., Hamilton v. Schriro, 74 F.3d 1545, 1549 (8th Cir. 1996); Holterman v. Helling, 70 F.3d 1276 (8th Cir. 1995) (table); Brown-El v. Harris, 26 F.3d 68, 69 (8th Cir. 1994); see also Flores v. City of Boerne, 73 F.3d 1352, 1355 (5th Cir. 1996) (city historic preservation ordinance); Droz v. Commissioner, 48 F.3d 1120 (9th Cir. 1995) (Social Security taxes), cert. denied, 116 S. Ct. 698 (1996). Bankruptcy courts in other jurisdictions have applied the RFRA retroactively. See, e.g., In re Tessier, 190 B.R. 396, 403 (Bankr. D. Mont. 1995) (applying RFRA to protect tithing, but holding RFRA is unconstitutional); In re Newman, 183 B.R. at 251 (holding RFRA does not protect tithing).

RFRA

On the merits the church argues that requiring the return of these contributions unfairly discriminates against religion in general and, more specifically, against religions (and the members of those religions) that believe in tithing. The church argues that exempting a personal residence or tools of a trade or household goods, see 11 U.S.C. § 522(d), but not religious contributions discriminates against religion. The church also argues that requiring the return of contributions discriminates against religions on the basis of the way in which they are supported. Some religions, like the church, emphasize tithing; others rely upon personal services, contributions from the public, fees for services, donations, or membership dues. The church also argues that, even among those religions that rely upon donations, religions like the church that encourage tithing at the traditional level of 10% are much more attractive to a trustee looking for potential assets than other religions. Brief for Appellant at 13 (table listing average % of household income donated to charity by denomination as 1.3 to 3.8%, much less than 10%).

For the reasons discussed below, we hold that the recovery of the contributions substantially burdens the debtors' free exercise

of their religion and is not in furtherance of a compelling governmental interest and therefore violates the RFRA. In light of this holding and because the RFRA is more protective of the right of free exercise than Smith, see, e.g., Flores v. City of Boerne, 73 F.3d at 1361 (describing RFRA as "a substantive expansion of First Amendment doctrine" and in effect "an assignment by Congress of a higher value to free-exercise-secured freedoms than the value assigned by the courts-- that is, strict scrutiny versus a form of intermediate scrutiny"), we need not consider whether the recovery of the contributions violates Smith. The parties did not raise the question of the constitutionality of the RFRA, and we do not consider the constitutionality of the RFRA. See id. at 1356-64 (holding Congress has authority under § 5 of fourteenth amendment to enact RFRA and RFRA does not usurp judiciary's power to interpret the Constitution). This circuit has applied the RFRA in other cases without questioning its constitutionality and thus has at least implicitly held that the RFRA is constitutional. But cf. Hamilton v. Schriro, 74 F.3d at 1557 (McMillian, J., dissenting) (arguing that the RFRA is unconstitutional because Congress does not have power under § 5 of the fourteenth amendment to enact RFRA); Tessier, 190 B.R. at 405-07 (holding RFRA is inconsistent with Smith and violates the separation of powers doctrine).

In Smith the Supreme Court held that the first amendment's free exercise clause does not bar application of a facially neutral law of general application to religiously motivated conduct. 494 U.S. at 881. In Smith two members of the Native American Church claimed that the state unfairly denied them unemployment compensation because their religious use of peyote was determined to be misconduct. The Court held that the free exercise clause did not bar the state from prohibiting sacramental peyote use and therefore denying unemployment benefits to Native Americans discharged for using peyote. Id. at 890. The Court expressly rejected the application of the compelling governmental interest and least restrictive means test set forth in cases like Sherbert

-21-

v. Verner, 374 U.S. 398 (1963), as unworkable and unnecessary in free exercise analysis.  494 U.S. at 885, 886-90.  Justice Scalia explained that whereas application of the compelling governmental interest test in fields such as equal protection or free speech produces constitutional norms, in the free exercise context it produces a "constitutional anomaly," that is, a private right to ignore generally applicable laws.  Id. at 886 (footnote omitted).  Justice Scalia emphasized that "'[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.'"  Id. at 887, citing Hernandez v. Commissioner, 490 U.S. at 699.  Justice Scalia cautioned that "courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim."  494 U.S. at 887.

Concerned that Smith did not adequately protect free exercise rights, in 1993 Congress passed the RFRA expressly in response to Smith.  Congress intended "to restore the compelling [governmental] interest test" as set forth in Sherbert v. Verner and Wisconsin v. Yoder, 406 U.S. 205 (1972), "to guarantee its application in all cases where free exercise of religion is substantially burdened" and "to provide a claim or defense to persons whose religious exercise is substantially burdened by government," 42 U.S.C. § 2000bb(b)(1), (2), "even if the burden results from a rule of general applicability."  Id. § 2000bb-1(a).

The threshold inquiry under the RFRA is whether the governmental action in question "substantially burdens" a person's religious practice.  This is a question of law which we review de novo.  Hamilton v. Schriro, 74 F.3d at 1552.  The individual has the burden of establishing the existence of substantial burden.  42 U.S.C. § 2000bb-1(a).  "[T]he governmental action must burden a religious belief rather than a philosophy or a way of life.  [T]he burdened belief must be sincerely held by the [person]."  Werner v.

-22-

McCotter, 49 F.3d 1476, 1480 n.1 (10th Cir.) (citing Wisconsin v. Yoder, 406 U.S. at 215-19), cert. denied, 115 S. Ct. 2625 (1995). In order to be considered a "substantial" burden, the governmental action must "significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual [religious] beliefs; must meaningfully curtail a [person's] ability to express adherence to his or her faith; or must deny a [person] reasonable opportunities to engage in those activities that are fundamental to a [person's] religion." Werner v. McCotter, 49 F.3d at 1480. Assuming for purposes of analysis that courts can constitutionally determine the parameters of religious belief, what beliefs are important or fundamental, and whether a particular practice is of only minimal religious significance, defining substantial burden broadly to include religiously motivated as well as religiously compelled conduct is consistent with the RFRA's purpose to restore pre-Smith free exercise case law. See Sasnett v. Sullivan, 908 F. Supp. 1429, 1440-45 (W.D. Wis. 1995) (extensive discussion of "substantial burden" requirement).

For purposes of analysis, we can assume that the recovery of these contributions would substantially burden the debtors' free exercise of religion. Even though the church encourages but does not compel tithing, the debtors consider tithing to be an important expression of their sincerely held religious beliefs. In other words, in the present case, tithing is religiously motivated, but not religiously compelled, practice. Permitting the government to recover these contributions would effectively prevent the debtors from tithing, at least for the year immediately preceding the filing of the bankruptcy petitions. We do not think it is relevant that the debtors can continue to tithe or that there are other ways in which the debtors can express their religious beliefs that are not affected by the governmental action. It is sufficient that the governmental action in question meaningfully curtails, albeit retroactively, a religious practice of more than minimal

-23-

significance in a way that is not merely incidental. Cf. In re Tessier, 190 B.R. at 403-04 (debtors testified that even though church would not sanction them for failing to tithe, their faithful exercise of their religion is "contingent" upon their continuing to tithe; holding that not allowing debtors to tithe under Chapter 13 plan substantially burdens free exercise right; however, noting that Chapter 7 trustee may attack religious giving by bringing a fraudulent transfer action against the religious institution under 11 U.S.C. § 548(a), as was done in the present case, or by dismissing the Chapter 7 case for substantial abuse under 11 U.S.C. § 707(b)). But cf. In re Newman, 183 B.R. at 251 (recovery of tithes already paid does not substantially burden free exercise because it does not prevent debtors from continuing to tithe; no evidence that 11 U.S.C. § 548(a)(2) prevented debtors, or any other member of church, from fulfilling their personally-held religious obligation to tithe at any time).

The next question is whether there is a compelling governmental interest. Once the individual has shown that the governmental action substantially burdens his or her free exercise right, the government must demonstrate that the substantial burden is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest. 42 U.S.C. § 2000bb-1(a), (b). These are questions of law which we review de novo. Hamilton v. Schriro, 74 F.3d at 1552. The RFRA does not define "compelling governmental interest." Compelling governmental interests have been described in a post-Smith establishment clause case as "interests of the highest order." Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 113 S. Ct. 2217, 2233 (1993). However, pre-Smith case law is instructive. For example, Hernandez v. Commissioner, 490 U.S. at 699, held that the governmental has a compelling interest in maintaining the tax system. United States v. Lee, 455 U.S. 252, 258-59 (1982), held that the government has a compelling interest in enforcing participation in the social security system. Case law

has recognized a compelling governmental interest in maintaining national security and public safety, <u>Gillette v. United States</u>, 401 U.S. 437 (1971); <u>Prince v. Massachusetts</u>, 321 U.S. 158, 165 (1944). <u>Wisconsin v. Yoder</u>, 406 U.S. at 213, held that the government has a compelling interest in providing public education. However, in <u>Sherbert v. Verner</u>, 374 U.S. at 406, the Court found no compelling governmental interest in preventing fraud in the unemployment compensation system. Cases applying the RFRA have held that the government has a compelling interest in enforcing participation in the social security system, <u>Droz v. Commissioner</u>, 48 F.3d at 1122-23, and in maintaining safety and security in prisons, <u>Hamilton v. Schriro</u>, 74 F.3d at 1554, and schools, <u>Cheema v. Thompson</u>, 67 F.3d 883, 885 (9th Cir. 1995) (ban on wearing of ceremonial knives on campus), as well as in providing public education, <u>Fleischfresser v. Directors of School District 200</u>, 15 F.3d 680, 690 (7th Cir. 1994) (reading skills program described as anti-Christian).

In the present case the question is whether the bankruptcy code in general and § 548(a)(2)(A) in particular constitute a compelling governmental interest. The trustee argues the bankruptcy code in general, and § 548(a)(2)(A) in particular, furthers the compelling governmental interests in allowing debtors to get a fresh start while at the same time protecting the interests of creditors by maximizing the debtor's estate. The bankruptcy cases decided under the RFRA are split. In <u>In re Newman</u>, 183 B.R. at 252, a case which, like the present case, involved an adversary proceeding brought by the Chapter 7 trustee to recover as fraudulent transfers under 11 U.S.C. § 548(a)(2) sums that the debtors had contributed to their church, the bankruptcy court concluded that § 548(a), and the Bankruptcy Code as a whole, served a compelling governmental interest. The <u>Newman</u> court specifically noted the important policies of allowing debtors to get a fresh start, treating creditors as fairly as possible, and the administration of the bankruptcy system, as well as the

historical importance of recovery of fraudulent transfers to bankruptcy law.  Id.  Cf. In re Navarro, 83 B.R. 348, 353 (Bankr. E.D. Pa. 1988) (pre-RFRA; administration of bankruptcy system and protection of legitimate interests of creditors are compelling governmental interests).  The Newman court also found that 11 U.S.C. § 548(a)(2) was the least restrictive means of furthering the compelling governmental interest.  183 B.R. at 252.

In comparison, the bankruptcy court in In re Tessier, 190 B.R. at 405, found no compelling governmental interest.  However, In re Tessier arguably interpreted the compelling governmental interest requirement more narrowly than In re Newman to include in the free exercise context "only those interests pertaining to survival of the republic or the physical safety of its citizens."  Id.  In re Tessier is procedurally distinguishable from the present case because it involved a Chapter 13 trustee's objection to the debtors' reorganization plan.  Nonetheless, it is substantively similar to the present case because the trustee objected to the debtors' charitable contribution of $100 per month to their church, in other words, a tithe.  The Tessier court acknowledged that "the government clearly has interests in . . . providing the debtor with a fresh start, efficiently administering bankruptcy cases, [and] protecting the interests of creditors," but concluded that such interests fell "short of direct national security and public safety concerns."  Id.  The Tessier court concluded that these interests, although "rational, and even important," were "not sufficiently grave to deserve the 'compelling' label when balanced against a parishioner's free exercise of religion."  Id., citing Sherbert v. Verner, 374 U.S. at 406 (the key compelling governmental interest case which rejected the government's claim that preventing fraud in unemployment compensation was a compelling governmental interest).  The Tessier court then held that the RFRA was unconstitutional, and thus had no effect on the bankruptcy code, because its restoration of the substantial burden/ compelling governmental interest test was inconsistent with Smith's "valid and neutral law of general

applicability" test for free exercise claims and violated the separation of powers doctrine.  190 B.R. at 405-07.

We agree with In re Tessier that the interests advanced by the bankruptcy system are not compelling under the RFRA.  Although we would not necessarily interpret compelling governmental interests as narrowly as the Tessier court did, we agree that bankruptcy is not comparable to national security or public safety.  We also agree that allowing debtors to get a fresh start or protecting the interests of creditors is not comparable to the collection of revenue through the tax system or the fiscal integrity of the social security system, which have been recognized as compelling governmental interests in the face of a religious exercise claim.  See, e.g., Droz v. Commissioner, 48 F.3d at 1122-24.  Moreover, we cannot see how the recognition of what is in effect a free exercise exception to the avoidance of fraudulent transfers can undermine the integrity of the bankruptcy system as a whole; its effect will necessarily be limited to the debtor's creditors, who will as a result have fewer assets available to apply to the outstanding liabilities, and not all creditors or even all debtors.  This is not to say that the recognition of a free exercise exception under these circumstances may not have adverse economic consequences for both creditors and debtors; for example, creditors may be more cautious in doing business with those who tithe or make contributions to religious organizations.

Because we hold that allowing debtors a fresh start and protecting the interests of creditors are not compelling governmental interests under the RFRA, we need not reach the question of whether the governmental action is the least restrictive means of furthering the compelling governmental interest.

In sum, we hold that because the substantial burden on the debtors' free exercise of religion is not furthered by a compelling

governmental interest, the RFRA provides a defense against the order of the district court permitting the trustee to avoid the debtors' contributions to the church under 11 U.S.C. § 548(a)(2)(A). The trustee is not entitled to recover $13,450 from the church.

Accordingly, the order of the district court is reversed.

BOGUE, Senior District Judge, dissenting.

While I agree with the majority's holding that the debtors did not receive reasonably equivalent value in exchange for the debtor's financial contributions to the church, I cannot agree with the decision on the merits under RFRA[1], and therefore respectfully dissent.

---

[1]I understand that the constitutionality of RFRA is not before us as this case is currently postured. That notwithstanding, I feel compelled to note the unusual specter of employing the analytical framework of RFRA, where the author of the majority opinion has indicated his belief that RFRA is unconstitutional. Hamilton v. Schriro, 74 F.3d 1545, 1557 (8th Cir. 1996)(McMillian, J., dissenting). Having reviewed and studied the author's thorough opinion in Hamilton, I am inclined to agree with his position. Further, cases relied on by the majority, regardless of the resolution on some issues, have ultimately found RFRA to be unconstitutional. In Re Tessier, 190 B.R. 396, 406-07 (Bankr. D. Mont. 1995). The constitutionality issue is particularly relevant in that employing RFRA, as opposed to the analysis under Employment Division v. Smith, 494 U.S. 872 (1990), "caused" the reversal in the current case, at least as I understand the Smith case. Put another way, "but for the passage of RFRA, the [church] could not have succeeded on [its] free exercise challenge to [11 U.S.C. § 5489(a)(2)]." Hamilton, 74 F.3d at 1561 (acknowledging that pre-RFRA standards were much less onerous as far as the government was concerned).

Given the statute's dubious constitutionality, I believe we should have requested supplementary briefing and hearing, along with certification to the Attorney General, on the constitutionality of RFRA.

The first step in RFRA analysis requires the plaintiff to establish that the challenged government action "substantially burdens" their free exercise of religion. If there is no substantial burden, the inquiry ends and the challenger's petition must fail. In re Newman, 183 B.R. 239, 251 (Bankr. D. Kan. 1995) ("If there is no substantial burden, RFRA does not apply."). Courts have articulated various standards required to make a showing of substantial burden.

I agree with the majority that RFRA does not compel the church to show that tithing is "required" by the church in order to prove a substantial burden. It is enough if the allegedly impinged conduct is motivated by a sincerely held religious belief. Sasnett v. Sullivan, 908 F. Supp. 1429, 1444 (rejecting a "religiously mandated" test in favor of a "religiously motivated" test for purposes of determining substantial burden).[2] That being said, it is important that the substantial burden step in the RFRA analysis is not reduced to a perfunctory determination or foregone conclusion. A searching inquiry is required to "protect[] the government from having to justify its regulations under a compelling interest standard if the burden on the asserted practice is incidental or de minimis." Id.

As stated by the majority, the governmental action must "significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual [religious] beliefs; must meaningfully curtail a [person's] ability to express adherence to his or her faith; or must deny a [person] reasonable opportunities to engage in those activities that are fundamental to a [person's] religion." Slip op. at 21. Although it is undisputed

---

[2]I also share the majority's concern as to whether courts can constitutionally determine "the parameters of religious belief, what beliefs are important or fundamental, and whether a particular practice is of only minimal religious significance ... ." Slip op. at 21.

that the debtors sincerely believe in tithing and that tithing is central to the religion they practice, I would conclude that the trustee's action of recovering monies tithed during the year the debtors were insolvent does not substantially burden the free exercise of their religion.

In coming to this conclusion, I note that the act of tithing by the debtors in the year preceding their filing for Chapter 7 protection was in fact executed, i.e., regardless of the eventual outcome, they were given the opportunity to practice their religion as they chose during the year they were insolvent. There was no "<u>constraint of conduct</u> or expression" respecting a central tenet of their belief, nor a curtailment of their ability to "<u>express adherence</u>" to their faith, nor were they denied reasonable opportunities to "<u>engage in those activities</u>" that were fundamental to their religion. They engaged in the conduct and activity of tithing and fully expressed adherence in their sincere belief in tithing to the church. Unfortunately, the debtors were insolvent during the year preceding February 1992 when they filed a joint Chapter 7 bankruptcy petition. As such the trustee properly sought to recover that for which the debtors did not receive reasonably equivalent value in exchange for their contributions to the church.

The trustee's act of recovering the tithes from the church under 11 U.S.C. § 548 (a)(2) does not change the fact that the debtors did all they could in the way of expressing and practicing their religious beliefs. I agree with the court in <u>In Re Newman</u>, which reasoned:

> there is no evidence that section 548(a) prevents the debtors or any other church member from tithing. Indeed, the present record certainly does not suggest that section 548 prevented these debtors from tithing. Equally important, the church has no records which might show that other members did not tithe because of section 548 since no one ever checks to see if members actually do tithe. The funds the trustee seeks to recover <u>have</u>

-30-

> already been tithed to the defendant.  The debtors, in
> all likelihood, continue to tithe to the defendant.  The
> debtors fulfilled their religious obligation by tithing
> in the year prior to their bankruptcy filing.  The
> statute, by its own operation, does nothing to prevent
> the debtors' fulfillment of their personally held
> religious obligation to tithe and, therefore, does not
> place a "substantial burden" on the debtors' practice of
> their religion.

In Re Newman, 183 B.R. at 251 (emphasis added).[3]

Further evidence of the lack of substantial burden is the uncontroverted fact that tithing is not required to fully participate in church services.  As noted by the majority, the parties have stipulated that church services were available to all persons regardless of whether any contributions were made.  The fact that the debtors' purely voluntary tithes were ordered retroactively recovered by the trustee does not change the fact that the debtors can attend church services, participate in church programs, and worship and believe as they choose.  They can continue to tithe as has been their custom, assuming no additional

---

[3]It cannot be denied that the work of religious organizations may be more important now than ever before.  Contributing, financially or otherwise, to further the mission of a religious organization is a laudatory practice.  That being said, religious contributions cannot be considered beyond reproach or regulation in all circumstances.  United States v. Lee, 455 U.S. 252, 261; 102 S. Ct. 1051, 1057; 71 L. Ed. 2d 127 (1982) ("... every person cannot be shielded from all burdens incident to exercising every aspect of the right to practice religious beliefs.  When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity.").  The debtors should be commended for their commitment to contributing to the church.  There is no dishonor in the fact that the tithes they offered during insolvency ought to be recovered by the trustee.  The reality is that the tithed money should be part of the estate available to creditors, who in good faith, advanced money, goods or services to the debtors upon the condition of repayment.

-31-

bankruptcy filings.  Given these facts, I cannot conclude the debtor's free exercise of religion was substantially burdened.

In my view, the church's failure to demonstrate a substantial burden would end the inquiry and would require affirmance.  Yet even if section 548 worked a substantial burden on the debtors' religious practice, I would conclude that the statute serves a compelling governmental interest and is the least restrictive means of achieving said interest.

Although stated in dicta, I agree with the district court's view that the bankruptcy code and § 548(a)(2)(A) furthers the compelling governmental interest in allowing debtors to get a fresh start while at the same time protecting the interests of creditors by maximizing the debtor's estate. In re Young, 152 B.R. 939, 954 (Bankr. D. Minn 1993); accord In re Newman, 183 B.R. at 252 ("Section 548(a), and the Bankruptcy Code as a whole, serve a compelling governmental interest.);  In Re Navarro, 83 B.R. 348, 353 (Bankr. E.D.Pa. 1988)(the "administration of the bankruptcy system and protection of the legitimate interests of creditors" serves a compelling governmental interest).

It can be fairly said that our nation's economy depends extensively on the availability of credit to individuals and businesses.  Bankruptcy is an extraordinary remedy for insolvent debtors and oftentimes harsh on creditors.  One of the creditor's few protections are recovery statutes like section 548, which as of today includes a free exercise exception for religious giving in the year preceding filing for bankruptcy.

The majority may be correct when it admonishes that today's decision may not, by itself, undermine the integrity of the bankruptcy system as a whole.  But I share the majority's apprehension that credit transactions involving persons with views similar to the current debtors may hereinafter involve a more

probing and delicate inquiry.  Given today's holding, are cautious potential creditors (including government or government-sponsored creditors) now expected to question applicants in depth regarding the highly personal activity of religious giving?  And what if said application is denied on the grounds that the applicant's religious giving makes extending credit an unwarranted risk?  Pragmatic issues aside, it is enough that all of society has a compelling interest in maintaining the balance between debtors and creditors in its current state.

Finally, I would find that section 548(a)(2) is the least restrictive means of furthering the above-articulated compelling interest.  Like the present action, In re Newman also involved a trustee's attempted recovery of tithed funds under 11 U.S.C. § 548(a)(2).  In finding that section 548(a)(2) passes the least restrictive means test, the court noted:

> The portion of the statute at issue in this case only allows for recovery those transfers of the debtor's property which occurred within one year of the bankruptcy filing, occurred while the debtor was insolvent, and that were not given in exchange for reasonably equivalent value.  Clearly, the statute was drawn in such a way as to balance the ability of the debtor to dispose of property with the need to protect unsecured creditors.  For example, if in this case the debtors had not been insolvent on the dates that the transfers to the defendant took place, then the transfers would not be recoverable.  Only when all of the requirements of § 548(a)(2) are met is the trustee able to recover the transfer.

In re Newman, 83 B.R. at 252.

The statute contains four specific elements, all of which are satisfied by the trustee in this case.  The statute is narrowly tailored, and the trustee closely followed the proper procedures set forth in the Bankruptcy Code for avoiding and recovering the donations, and took no action against these debtors which would not

-33-

be taken against any other transferee in the same factual situation.

In conclusion, I would hold that the trustee has satisfied the requirements of RFRA and would affirm the district court.

A true copy.
    Attest:
        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.