**In re Kenneth Eugene McLEROY and Diana Daun McLeroy, Debtors.**

**Educational Credit Management Corporation, Appellant,**

v.

**Kenneth Eugene McLeroy and Diana Daun McLeroy, Appellees.**

**Nos. 99–50895–7, Civ.A. 5:00–CV–008–C.**

United States District Court,
N.D. Texas,
Lubbock Division.

July 10, 2000.

John C Akard, U.S. Bankruptcy Court, Chambers of Judge John C. Akard, Lubbock, TX, pro se.

John Kendrick Turner, Bell Nunnally & Martin, McKinney Plaza, Dallas, TX, for Educational Credit Mangement Corp., appellant.

J. Edwin Price, Price, Heald. & Price, Lubbock, TX, for Kenneth Eugene McLeroy, Diana Daun McLeroy.

William T. Neary, U.S Dept. of Justice, Dallas, TX, for William T. Neary, trustee.

## *ORDER*

CUMMINGS, District Judge.

Presently before the Court is an appeal in the above-styled case from the Bankruptcy Court. On February 11, 2000, Appellant Educational Credit Management Corporation ("ECMC") filed its brief. On February 25, 2000, Appellees Kenneth Eugene McLeroy and Diana Daun McLeroy

(collectively, "the McLeroys") filed their brief, to which ECMC replied on March 14, 2000. After careful consideration of the record, the opinion of the court below, and all other relevant arguments and evidence, the Court **VACATES** the Bankruptcy Court's judgment and **REMANDS** this case to the Bankruptcy Court for further proceedings not inconsistent with this Order.

## I.

## BACKGROUND

Because the facts do not appear to be in dispute, the Court will mention only the most pertinent facts in the case. In 1992 and 1993, Kenneth McLeroy executed certain educationally related promissory notes, known as PLUS loans,[1] to fund his two sons' undergraduate college educations. Thereafter, Mr. McLeroy suffered serious heart conditions, including numerous heart attacks, and the McLeroys incurred extensive debt related to Mr. McLeroy's medical treatment.

On August 4, 1999, the McLeroys filed a bankruptcy petition pursuant to Chapter 7 of the Bankruptcy Code. Five days later, they filed an adversary action with the Bankruptcy Court against the Student Loan Marketing Association ("Sallie Mae"), seeking a determination that the PLUS loans were dischargeable as an "undue hardship" under 11 U.S.C. § 523(a)(8). As the result of an agreement between ECMC and Sallie Mae, the PLUS loans were assigned to ECMC, which was substituted as the Defendant in this case.

On November 29, 1999, the Bankruptcy Court held a hearing in the matter. Daun McLeroy testified that the debtors' budget included a tithe to their church in the amount of approximately $490.00 per month. Other evidence established that the McLeroys earn between $2,215.07 and $2,399.65 of income per month. Mrs. McLeroy said she and her husband have tithed for forty years,[2] and that she believed not tithing is akin to "robbing God."

During cross-examination of Mrs. McLeroy at the hearing, Mr. John Turner, counsel for ECMC, attempted to. inquire into the debtors' necessity to tithe $490.00 per month;[3] his line of questioning, however, was terminated when the Bankruptcy Judge *sua sponte* interjected that the McLeroy's tithing practices could not be considered.[4] When later inquiring about

1. A PLUS loan, an acronym for Parent Loan for Undergraduate Students, is authorized by 20 U.S.C. § 1078-2.

2. It is unclear how long the debtors have been tithing more than 15 percent of their income, though Ms. McLeroy testified that the tithe had been increased by $2.50 per week from the previous year.

3. It is apparent that Mr. Turner's questions attempted to address the factors set out in *Lynn v. Diversified Collection Serv. (In re Lynn)*, 168 B.R. 693, 700 (Bankr.D.Ariz. 1994), discussed *infra*.

4. See Hr'g Tr. at 25–26; lines 10–25, 1–17:
Q [By Mr. Turner]: On your Schedule J, you have indicated that your charitable contributions to the Church of Christ is $490.00 a month.
MR. TURNER: May I approach, Your Honor?
THE COURT: Yes, sir.
Q (By Mr. Turner): Do you see where I pointed out on your Schedule J the monthly expense for your charitable contributions is $490.00?
A [By Mrs. McLeroy]: Yes.
Q Okay. Did you continue to make that contribution at that level previously while Ken was sick?
A Yes, sir.
Q Did he continue receiving a salary from work while he was—
A Yes, sir.
Q—while he was sick?
A Yes, sir.
Q Okay. Does your church have any kind of a policy on tithing?
A No, sir.
Q Okay. The church itself has no requirement that you tithe?
A Exactly what the Bible says.
Q I guess my question is: Is there any kind of requirement in membership that you donate a certain percentage of your income?
A No, sir; no, sir.
Q Would it be frowned upon in your church if—

whether the McLeroys claimed a tax deduction for their tithes, the Bankruptcy Judge, on objection from Mr. Price, counsel for the debtors, again terminated ECMC's questioning as it related to the McLeroys' tithing practices.[5]

During closing arguments, the McLeroys argued that the Religious Liberty and Charitable Donation Protection Act of 1998 ("the RLCDPA"), Pub.L. No. 105–183, 112 Stat. 517 (codified as amended in scattered sections of 11 U.S.C.), protects their tithing practices from being used to defeat their request for discharge of the student loans.[6] ECMC conceded the notion that

the federal law protects a debtor's right to tithe; however, it suggests that Congress' intent behind the RLCDPA was only intended to address bankruptcy trustees' actions as they attempted to recover fraudulent transfers.[7]

At the end of closing arguments, the Court made the finding that debtors satisfied their burden of proving undue hardship under 11 U.S.C. § 523(a)(8) as interpreted in *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2nd Cir.1987), and found that Mr. McLeroy's student loan obligations to

---

THE COURT: Counsel, she is entitled to make that under the [Religious Liberty and] Charitable [Donation Protection] Act. There is absolutely nothing I can do about it. That was passed last—effective last October. As long as she is doing it regularly, it cannot be considered.
(alterations added).

**5.** See Hr'g Tr. at 27–28; lines 21–25, 1–25:
Q [By Mr. Turner]: Does your church monitor your charitable contributions for tax purposes?
A [By Mrs. McLeroy]: No; no.
Q Okay. So if you were going to elect to on your tax return, you know, deduct—to itemize deductions for charitable contributions, would the church be able to give you a statement for tax purposes of your annual contribution?
MR. PRICE: Your Honor, I am going to object to this line of questions as being irrelevant. Under the ruling that the Court mentioned a moment ago, the [Religious Liberty and] Charitable [Donation Protection] Act, none of this is relevant or can be considered by the Court, and I think we are just wasting the Court's time.
MR. TURNER: Your Honor, I would contend it is relevant because other than a couple of—the debtor's testimony about the contributions, there is no evidence that—
THE COURT: Well, did you do any discovery to the church? The only testimony we have is that she has done it regularly all this time, and whether they give her a certificate or not makes no difference.
MR. TURNER: Your Honor, I believe our interrogatory—our discovery requests directed towards the debtor requested all documentation pertaining to the contributions.
, THE COURT: She attached some checks. If that wasn't sufficient, that is up to you to get them. Counsel, that statute is very

clear. I am not going to let you discuss that anymore.
(alterations added).

**6.** See Hr'g Tr. at 33, lines 12–19:
[By Mr. Price]: The Court is correct, and I would like, for the record, to submit that the Religious Liberty and Charitable Donation Protection Act, that Public Law 105–183 is the standard there, and that while we are a little bit over the 15 percent of the gross income, we are not much over, and I appreciate the Court pointing that out to opposing Counsel, so we don't think that the tithing factor should come into play.

**7.** See Hr'g Tr. at 37–38, lines 24–25, 1–8:
[By Mr. Turner]: With regard to the tithing question, Your Honor, we don't contend the debtor is not entitled to tithe. That simply just doesn't recognize the most recent legislation by Congress; however, you know, I beg to differ with the construction as applied here.
My understanding of the congressional intent, the religious tithing act was to protect religious institutions from having bankruptcy trustees try to sue the institutions themselves to recover preferential payments or insider transfers made as tithes. It is not the situation here.
Also, looking at the budget, you know, they have the ability to make these payments and still tithe, and to the extent that, you know, their budget is close or it is tight, I think that is an equitable call for the Court to make. I don't think the act stands in the way of the Court interpreting their situation to be such that this is not an undue hardship, but rather an ordinary one to the extent their decision to tithe may constrain their budget.

ECMC should be discharged.[8] While acknowledging ECMC's position that the RLCDPA related to a trustee's ability to recover preferential transfers, the Court added that the Act instructed "the Court ... to allow religious contributions to the extent that they had previously been made."[9] The Court then found, "Ms. McLeroy credibly testified that she had made those contributions for forty years and that it was a regular contribution, so that matter cannot be considered."[10] Whereupon, ECMC timely brought this appeal.

## II.

### STANDARD OF REVIEW

The United States District Court, acting as an appellate court in reviewing bankruptcy decisions, utilizes the same standard of review generally applied by a federal court of appeals. *Webb v. Reserve Life Ins. Co. (In re Webb)*, 954 F.2d 1102, 1104 (5th Cir.1992). The Court, therefore, conducts a *de novo* review of the bankruptcy court's conclusions of law and applies the clearly erroneous standard of review to the bankruptcy court's findings of fact. *Rolling Plains Prod. Credit Ass'n v. Cook (In re Cook)*, 169 F.3d 271, 274 (5th Cir.1999). Under the "clearly erroneous" standard, the court must defer to the bankruptcy court's findings of fact unless it is left with the definite and firm conviction that a mistake has been made. *Cajun Elec. Power Coop. Inc. v. Southwestern Elec. Power Co. (In re Cajun Elec. Power Coop.)*, 150 F.3d 503, 513 (5th Cir.1998), *cert. denied*, 526 U.S. 1144, 119 S.Ct. 2019, 143 L.Ed.2d 1031 (1999).

When examining provisions of the Bankruptcy Code, appellate courts are instructed to begin with a construction of the statute's language. *CompuAdd Corp. v. Texas Instruments (In re CompuAdd Corp.)*, 137 F.3d 880, 882 (5th Cir.1998).

Absent an express, contrary definition of a certain term in the Bankruptcy Code, "Congress intends the words in its enactments to carry their ordinary, contemporary, common meaning." *Pioneer Investment Servs. v. Brunswick Assocs.*, 507 U.S. 380, 388, 113 S.Ct. 1489, 123 L.Ed.2d. 74 (1993), *cited in Boyce v. Greenway (In re Greenway)*, 71 F.3d 1177, 1179 (5th Cir.1996) (internal citations omitted). As a part of that analysis, however, the Supreme Court has cautioned, "[W]e must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *United States v. Heirs of Boisdore*, 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009 (1850), cited in *CompuAdd Corp.,* 137 F.3d at 882. As a result, "[t]he plain meaning of legislation should be conclusive, except in the rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." *United States v. Ron Pair Enter., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (internal quotations omitted, alterations in original).

## III.

### ANALYSIS

The primary question posed to this Court is this: have the provisions of 11 U.S.C. § 523(a)(8) been amended by the Religious Liberty and Charitable Donation Protection Act, thereby allowing debtors' tithing practices or charitable donations to be considered as an appropriate expense in the analysis of what constitutes an undue hardship? Because the Court holds that the RLCDPA's provisions do not apply to 11 U.S.C. §. 523(a)(8), the Court finds the standards set forth in *In re Lynn* continue to provide guidance when tithing is considered in undue hardship adversary suits. The Court, therefore, holds that the Bankruptcy Court committed error in terminat-

---

8. See Hr'g Tr. at 39, lines 20–21.

9. Hr'g Tr. at 39, lines 21–25.

10. Hr'g Tr. at 39–40; lines 25, 1–4.

ing ECMC's cross-examination regarding the debtors' tithing habits and beliefs on tithing.

### A. Overview of 11 U.S.C. § 523(a)(8)

■■■ Congress drafted the Bankruptcy Code with an intent to "provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.' " *Grogan v. Garner (In re Garner)*, 498 U.S. 279, 286, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), citing *Local Loan Co. v. Hunt (In re Hunt)*, 292 U.S. 234, 244, 54 S.Ct. 695, 78 L.Ed. 1230 (1934). Such an opportunity at a fresh start, however, is limited to the "honest but unfortunate debtor." *In re Hunt*, 292 U.S. at 244, 54 S.Ct. 695. Within this framework, the provisions of 11 U.S.C. § 523(a) have been interpreted in light of Congress' conclusion "that the creditors' interest in recovering full payment of debts ... outweighed the debtors' interest in a complete fresh start." *In re Garner*, 498 U.S. at 287, 111 S.Ct. 654 (ellipsis added).

The language of 11 U.S.C. § 523(a) reads in relevant part:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> > (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, ... unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.

(ellipsis added).[11] Section 523(a)(8) was passed by Congress amid reports of students who took advantage of the fresh

start policy by filing petitions for bankruptcy and subsequently sought discharge of their student loans after graduation. *See Federal Credit Union v. DelBonis (In re DelBonis)*, 72 F.3d 921, 936 (1st Cir. 1995); *Andrews Univ. v. Merchant (In re Merchant)*, 958 F.2d 738, 740 (6th Cir. 1992). In fact, the Bankruptcy Court in the present case recognized in an earlier opinion that Congress added subsection 8 to § 523(a)

> in order to protect the United States Treasury, as well as to protect the solvency of the guaranteed student loan program. By enacting § 523(a)(8), Congress sought principally to protect government entities and non profit institutions of higher education—organizations which lend money or guarantee loans to individuals for educational purposes— from bankruptcy discharge.

*McClure v. Action Career Training (In re McClure)*, 210 B.R. 985, 986–87 (Bankr. N.D.Tex.1997) (Akard, J.).

■■■ Given the congressional intent of § 523(a)(8), many courts have determined that a debtor must satisfy three elements in order to be entitled to the discharge of his or her student loan: (1) an inability to maintain, based on current income and expenses, a minimal standard of living for itself and its dependents if forced to repay the loan; (2) the existence of additional circumstances which indicate that the debtor's state of affairs is likely to persist for significant portions of the repayment period of the student loan; and (3) the debtor's good faith efforts to repay the loans. *See Brunner*, 831 F.2d at 396; *Coveney v. Costep Serv. Agent (In re Coveney)*, 192 B.R. 140, 142 (Bankr.W.D.Tex. 1996).

Prior to the passage of the RLCDPA, the United States Bankruptcy Court for the District of Arizona was the first to

---

**11.** The Court finds it notable that Congress amended 11 U.S.C. § 523(a)(8) to its present language in 1998 with the passage of Public Law 105–244; it became effective within four months of the time the amendments by the Religious Liberty and Charitable Donation Protection Act went into effect. However, the two acts make no mention of one another in either their language or legislative history.

address whether a bankruptcy debtor's tithing habits could be considered within the context of a student loan discharge under Section 523(a)(8) as interpreted under the test enunciated in *Brunner,* in *Lynn v. Diversified Collection Serv. (In re Lynn),* 168 B.R. at 700. In *Lynn,* a Chapter 7 bankruptcy debtor filed an adversary complaint and sought to have her student loan of more than $7,000 discharged as an undue hardship. She included her monthly tithe to her church as a valid expense under that test. *Id.* The debtor testified she held strong religious beliefs and a commitment to turn over ten percent of her gross wages to her church. *Id.,* at 696. However, she also acknowledged that her church did not require its members to tithe when they were impoverished, and that her decision to tithe when she earned any income was a personal one. *Id.*

After holding that the provisions of 11 U.S.C. § 523(a)(8) were constitutionally content neutral, the court found that a debtor may be able to include a tithe as a valid expense when proving the existence of undue hardship under the *Brunner* test. *Id.* However, the court then found that the debtor's tithes could not be used as a means of supporting her undue hardship claim in that case because the debtor's church provided services to her regardless of her ability to tithe. It wrote:

> [T]o the extent this Court must consider tithing and whether it is an appropriate expense to be considered in an analysis of what constitutes an undue hardship, this Debtor has failed to meet her burden of proof on the issue. In this case, the Debtor receives services or benefits from her church, irrespective of whether she tithes. The Debtor has a strong commitment to continue to tithe and has done so for a number of years. Howev-

er, she has also conceded that her church permits her to cease tithing under certain circumstances, such as her impoverishment.

*Id.* (alterations added).

■ Despite the court's finding that the debtor failed to satisfy her burden of showing why her tithing practices should be considered, at least one court has cited to *Lynn* as supportive of the proposition that a debtor's tithing habits may be considered in a § 523(a)(8) action to discharge a student loan. *See In re Cavanaugh,* 175 B.R. 369, 374 (Bankr.D.Idaho 1994). This Court agrees with the reasoning in *Lynn,* and holds that a debtor's tithes may be considered in some circumstances as an appropriate expense for the purpose of determining undue hardship in a § 523(a)(8) adversary action to discharge a student loan. Because the Bankruptcy Court in the present case found that the RLCDPA automatically provides such protection as a matter of right, provided that the debtor's tithes are within the Act's statutory ceiling, however, the Court next examines the language and legislative intent of the RLCDPA.

### B. Plain Language of the RLCDPA

The Court begins an analysis of the Religious Liberty and Charitable Donation Protection Act of 1998 by examining the statute's language in the context of its amendments to the Bankruptcy Code. The RLCDPA amends portions of 11 U.S.C. §§ 544 (trustee as lien creditor and as successor to certain creditors and purchasers), 546 (limitations on avoidance powers), 548 (fraudulent transfer provisions), 707 (dismissal of cases), and 1325 (post-petition charitable contributions under Chapter 13).[12] This Court finds the provisions of

---

12. The RLCDPA also states in a section titled "Applicability":

This Act and the amendments made by this Act shall apply to any case brought under an applicable provision of title 11, United States Code, that is pending or commenced

on or after the date of enactment of this Act.

Religious Liberty and Charitable Donation Protection Act of 1998, Pub.L. No. 105–183, 112 Stat. 517, 519. However, as discussed below, this Court finds that the RLCDPA's

11 U.S.C. § 548 to be most relevant to the present case. That section, as amended, states in relevant part:

(a)(1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

(2) A transfer of a charitable contribution to a qualified religious or charitable entity or organization shall not be considered to be a transfer covered under paragraph (1)(B) in any case in which—

(A) the amount of that contribution does not exceed 15 percent of the gross annual income of the debtor for the year in which the transfer of the contribution is made; or

(B) the contribution made by a debtor exceeded the percentage amount of gross annual income specified in subparagraph (A), if the transfer was consistent with the practices of the debtor in making charitable contributions.

11 U.S.C. § 548. In support of the Bankruptcy Court's findings, the McLeroys' brief merely contains the conclusory statement that "Public Policy and the RLCDPA support a Debtor's decision to tithe while embroiled in a Bankruptcy proceeding." It appears that the McLeroys then attempt to argue in the alternative that even if the Court finds the RLCDPA to be inapplicable to adversary actions brought under § 523(a)(8), the Bankruptcy Court's judgment should be affirmed as it is supported by the Religious Freedom Restoration Act of 1993 ("the RFRA"), 42 U.S.C. § 2000bb, *et seq.*

■ After reviewing the arguments and authority cited by each party, the Court finds that the RLCDPA has no application to 11 U.S.C. § 523(a)(8), and that debtors are not entitled under the Act to automatically refer to their tithing practices as an appropriate expense under the undue hardship test of *Brunner.* The plain language of the Bankruptcy Code's relevant section as amended by the RLCDPA only addresses the avoidance powers of the bankruptcy trustee. The Act makes no mention of conferring any additional rights upon any other party and is devoid of any reference to § 523(a)(8).

The Court's reading of 11 U.S.C. § 548 is supported by a recent decision of the U.S. Supreme Court in *Hartford Underwriters Ins. Co. v. Union Planters Bank,* 530 U.S. ——, 120 S.Ct. 1942, 1947–48, 147 L.Ed.2d 1 (2000). In that case, the Court examined the language of 11 U.S.C. § 506(c)[13] to determine if administrative

provisions do not apply to 11 U.S.C. § 523(a)(8).

**13.** 11 U.S.C. § 506(c) provides as follows:
The trustee may recover from property securing an allowed secured claim the rea-sonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim.

claimants of a bankruptcy estate were afforded an independent right to seek payment of their claims from property encumbered by a secured creditor's lien. Similar to the issues before this Court, *Hartford Underwriters* addresses whether the statute's use of the phrase "[t]he trustee may" enables *only* the trustee to take action, or whether the phrase empowers the trustee to take action *in addition* to the rights of others. Justice Scalia, writing for a unanimous Court, held that the powers granted in § 506 applied solely to the trustee and those who are expressly given the rights and powers of the trustee by law. *Id.*, at 1947. He reasons:

> Here, the statute appears quite plain in specifying who may use § 506(c)—"the trustee." It is true, however, as petitioner notes, that all this actually "says" is that the trustee may seek recovery under the section, not that others may not. The question thus becomes whether it is a proper inference that the trustee is the only party empowered to invoke the provision. We have little difficulty answering yes.

Several contextual features here support the conclusion that exclusivity is intended. First a situation in which a statute authorizes specific action and designates a particular party empowered to take it is surely among the least appropriate in which to presume nonexclusivity. "Where a statute ... names the parties granted [the] right to invoke its provisions, ... such parties only may act." 2A N. SINGER, SUTHERLAND ON STATUTORY CONSTRUCTION § 47.23, p. 217 (5th ed.1992) (internal quotation marks omitted); see also *Federal Election Comm'n v. National Conservative Political Action Comm.*, 470 U.S. 480, 486, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985). Second, the fact that the sole party named—the trustee—has a unique role in bankruptcy proceedings makes it entirely plausible that Congress would provide a power to him and not to others.

*Id.* (Scalia, J.) (alterations and ellipses in original; footnotes omitted). The plain language of 11 U.S.C. § 548, as amended by the RLCDPA, only addresses the instances in which a trustee may seek to set aside an allegedly fraudulent transfer. Thus, the Court, in applying the reasoning of *Hartford Underwriters*, likewise holds that 11 U.S.C. § 548 only refers to the authority of the bankruptcy trustee, a party with a unique role in bankruptcy proceedings. Because the present case does not involve actions taken by a trustee, the Bankruptcy Court erred in finding that debtors could use the provisions of the RLCDPA as an automatic way of proving up their tithing expenses for the purposes of satisfying their undue hardship burden.

The Court also finds that its reading of 11 U.S.C. § 548 and the RLCDPA is consistent with the new law's legislative history. Representative George Gekas pointed out during debates on the bill that the ultimate purpose of the RLCDPA was to reduce a bankruptcy trustee's ability to attempt to recover charitable donations from a church under the fraudulent transfer provisions of the Bankruptcy Code. 144 CONG.REC. H3999–02 (June 3, 1998) (statement of Rep. Gekas). Senator Charles Grassley, the sponsor of the Senate version of the bill which was ultimately signed into law, took a similar position and stated:

> When I held hearings on this bill before my subcommittee, I learned that churches and charities around the country are experiencing a spate of lawsuits by bankruptcy trustees trying to undo tithes or charitable donations. Under provisions of the Bankruptcy Code originally designed to fight fraudulent transfers of assets or money on the eve of bankruptcy, bankruptcy trustees have begun to sue churches when one of their parishioners declares bankruptcy, charging that tithes are fraud.

> Of course, this puts the fiscal health of many churches at serious risk. Most churches and charities don't have big bank accounts. Having to pay back

money that has been received and already spent is a real hardship for churches which often live on a shoestring budget. S.1244 will protect against that.

144 Cong.Rec. S4769–01 (May 13, 1998) (statement of Sen. Grassley) Representative Ron Packard, the sponsor of the House version of the bill, referred to the Eighth Circuit's decision in *Christians v. Crystal Evangelical Free Church,* 82 F.3d 1407 (8th Cir.1996), *vacated,* 521 U.S. 1114, 117 S.Ct. 2502, 138 L.Ed.2d 1007 (1997), which pertains to the RFRA's effect upon fraudulent transfer provisions of the Bankruptcy Code, and argued for passage of the RLCDPA so that "[d]onations received in good faith from individuals will not be taken from [churches' and charities'] pockets by creditors." 143 Cong.Rec. E2037–01 (Oct. 21, 1997) (statement of Rep. Packard) (alterations added). Although the Court has found in the debates on the bill some general references to debtors' tithing rights, the vast majority of testimony and debate on the purposes of the Act pertains to the fraudulent transfer provisions of the Bankruptcy Code. Furthermore, the Court could find no reference to amendments to § 523(a)(8) by the RLCDPA.

The Court is aware of the findings by the U.S. Bankruptcy Court for the Eastern District of New York, in *Lebovits v. Chase Manhattan Bank (In re Lebovits),* 223 B.R. 265, 272 (Bankr.E.D.N.Y.1998), which appear to conclude without any examination of the Act's language or intent

that the RLCDPA prevents creditors of Chapter 7 debtors from challenging the debtor's tithes in student loan discharge cases. Given the language and legislative intent behind the RLCDPA, however, the Court believes its holding today is the better reasoned and more consistent application of the provisions of the Bankruptcy Code.[14]

### C. The RFRA

■ The Court also holds that the Religious Freedom Restoration Act of 1993, codified at 42 U.S.C. § 2000bb *et seq.,* does not support the debtors' and the Bankruptcy Court's legal findings regarding tithing practices and 11 U.S.C. § 523(a)(8). In its brief, debtors provide no real support for their position, other than to say, "Since the RLCDPA does not abrogate the RFRA, it stands to reason that Appellant's arguments concerning the Bankruptcy Court's purported error of the application of the RLCDPA are untenable and incorrect." It is unclear what the debtors mean by such a statement. Nevertheless, the Court finds the RFRA has no bearing in the present case. In its 1997 decision in *City of Boerne v. Flores,* 521 U.S. 507, 535, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), the U.S. Supreme Court held the RFRA to be unconstitutional, and stated:

> When the exercise of religion has been burdened in an incidental way by a law of general application, it does not follow that the persons affected have been bur-

---

14. The Court notes that its holding is consistent with similar findings made in two other Chapter 7 cases. In *Wegrzyniak v. United States (In re Wegrzyniak),* 241 B.R. 689, 694 n. 4 (Bankr.D.Idaho 1999), the court declined to determine whether the RLCDPA had any impact upon 11 U.S.C. § 523(a)(8). However, it did note, "The amendments [of 11 U.S.C. §§ 1325(b)(2)(A) and 548(a)(2) through passage of the RLCDPA] do not specifically relate to the Court's consideration of issues under § 523(a)(8)." (alterations added). In *Dennison v. Hammond (In re Hammond),* 236 B.R. 751, 766 (Bankr.D.Utah 1998), the court found the RLCDPA did not affect the provisions of 11 U.S.C. § 523(a)(15)(A), and held:

> Had Congress intended to allow charitable contributions to be factored into income reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor it would have so stated.... The negative pregnant rule of statutory construction requires than an express statutory statement, such as the amendments to § 1325(b)(A), contrasted with the statutory silence regarding including [sic] charitable contributions in § 523(a)(15)(A), shows an intent to confine the allowance of charitable contributions to § 1325(b)(A).
>
> *Id.,* at 767–68 (internal citations omitted).

dened more than other citizens, let alone burdened because of their religious beliefs.

(Kennedy, J.). Although the Eighth Circuit has subsequently held that the RFRA is alive and is constitutional as applied to 11 U.S.C. § 548, in its rehearing of *In re Young,* 141 F.3d 854, 861 (8th Cir.), *cert. denied,* 525 U.S. 811, 119 S.Ct. 43, 142 L.Ed.2d 34 (1998), this Court has previously found that the fraudulent transfer provisions of the Bankruptcy Code are inapplicable in the present case. Thus, the Eighth Circuit's resolution of *Young* is not relevant to the question at bar.

### D. The Debtors' Waiver Argument

■ The McLeroys additionally argue that even if this Court finds the provisions of the RLCDPA and the RFRA to be inapplicable, the Bankruptcy Court's judgment should nevertheless be affirmed as ECMC failed to object or create a bill of review as to the information it intends to obtain. Under Rule 103(a)(2), Federal Rules of Evidence, a party must make an offer of proof when a judge makes a ruling excluding evidence, unless it "was apparent from the context within which questions were asked." In the present case, the nature of the proposed testimony was apparent from the following: (1) the questions put forth by ECMC's counsel; (2) counsel's colloquy following the Debtors' objection before he was subsequently cut off and admonished by the Bankruptcy Judge; and (3) the Debtors' and the Bankruptcy Judge's response regarding the RLCDPA. This Court, therefore, finds that ECMC did not waive its right to pursue this issue on appeal.

### IV.

### CONCLUSION

The Court cautions that its holding should not be read to conclude that debtors in bankruptcy have no right to tithe or provide support for charitable organizations. Such a holding would be counter to the plain language and spirit of the Bank-

ruptcy Code. This opinion is limited to the instance in which a debtor's tithing practices or charitable contributions are sought to be considered as a necessary expense under 11 U.S.C. § 523(a)(8) for the purpose of discharging student loan indebtedness.

Finding that the Bankruptcy Court committed reversible error in its interpretations of law, the Court is of the opinion that the judgment of the Bankruptcy Court should be **VACATED,** and the matter should be **REMANDED** for further proceedings not inconsistent with this Order. All relief not expressly granted is denied.