In re Justin CHASSER, Debtor.

Justin Chasser, Plaintiff,

v.

United Student Aid Funds, Florida Department of Education, Nelnet LNS, Perimeter Credit LLC, RI Higher Education, USA Funds, Windham Professionals, Inc., Defendants.

Bankruptcy No. 9:05–bk–25993–ALP.
Adversary No. 9:05–ap–00918–ALP.

United States Bankruptcy Court,
M.D. Florida,
Fort Myers Division.

June 12, 2008.

Scott Alan Orth, Law Offices of Scott Alan Orth PA, Miami Shores, FL, for Plaintiff.

Pamela Teixeira Lutton, Office of the Attorney General, Tallahassee, FL, Christie D. Arkovich, Law Offices of Christie D. Arkovich PA, Tampa, FL, for Defendants.

### FINDINGS OF FACT, CONCLUSION OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, United States Bankruptcy Judge.

THE MATTER under consideration in this Chapter 7 liquidation case of Justin Chasser (Debtor) is a Complaint filed by the Debtor on December 13, 2005, suing United Student Aid Funds, Florida Department of Education (FDOE), Nelnet LNS, Perimeter Credit LLC, RI Higher Education, USA Funds and Windham Professionals, Inc. In his Complaint, the Debtor seeks a determination by this Court that the balance owed by him on his student loans should be determined to be a dischargeable obligation and not within the exceptions to discharge provided for in Section 523(a)(8) of the Bankruptcy Code and covered by the general discharge provided to individuals pursuant to Section 727(a) of the Bankruptcy Code.

Ultimately, all of the Defendants were duly served with the summons. NelNet, LNS, Perimeter Credit, LLC and Windham Professionals failed to respond to the Complaint. As a result, in due course, the Clerk of Court entered a default against the above-stated Defendants. Thus, it is appropriate to enter a final judgment of default in favor of the Debtor and against the defaulting Defendants.

The Debtor contends that the loan obligation owed to each of the remaining Defendants should be discharged because either:

(1) The Defendant does not hold a debt that is an educational loan made by or guaranteed by a government unit or non-profit institution; or

(2) The Defendant does not hold a debt that is a qualified educational loan under IRC § 221(d)(1); or

(3) The failure to discharge these debts would be a hardship on the Debtor.

Educational Credit Management Corporation (ECMC), which was not named as a defendant in the lawsuit, filed an Answer to the Complaint based on ECMC's acquisition of the student loans previously held by United Student Aid Funds, USA Funds, and Rhode Island Higher Education Assistance Authority (Rhode Island). Based on the acquisition, this Court entered an Order to substitute ECMC as a

Defendant in this adversarial proceeding. Therefore, in order to clarify the record, ECMC filed a Motion to Substitute Educational Credit Management Corporation as Party Due to Transfer of Interest (Doc. No. 117) as defendant in the Complaint in place of Rhode Island, *nunc pro tunc*, as of March 15, 2006. The only remaining Defendants are Florida Department of Education (FDOE) and ECMC (collectively, the Defendants or the Department of Education (DOE)).

The Debtor obtained several Stafford student loans during the period of October 17, 2004 through March 12, 2006. The Debtor obtained a total of five (5) student loans from Rhode Island to attend Johnson & Wales University (Johnson & Wales) located in Miami, Florida. The Debtor completed his education at Johnson & Wales and obtained his A.S. Degree in Culinary Arts. The Debtor also attended Miami Dade Community college and Florida International University, located in Miami, Florida. The Debtor did not complete his educational studies at these facilities.

The Debtor in his Complaint also asserts that the Defendants, FDOE and ECMC do not hold debts that are educational loans made by or guaranteed by a governmental unit or non-profit institution. Furthermore, the Debtor asserts that the Defendants, FDOE and ECMC do not hold debts that qualify as educational loans under IRC § 221(d)(1).

This Court is satisfied that based on the evidence presented at the hearing by FDOE and ECMC, the educational loans are guaranteed by a governmental unit or non-profit institution, and such loans do qualify as a educational loans pursuant to IRC § 221(d)(1). (FDOE's Exhibits 2, 3, 4, 5, 6, and 7 and ECMC's Exhibits 1, 2, and 3). Therefore, the remaining issue currently before this Court is whether or not the student loans described above are dischargeable pursuant to Section 523(a)(8) of the Bankruptcy Code.

The Debtor contends that the failure to discharge these debts would be a hardship. He further contends that he has been unable to secure a job by which he can support himself or a job with a career path to an income that would allow him to support himself and, therefore, be able to make significant payments to his creditors. Additionally, the Debtor contends that he has attempted to become or maintain employment and has made efforts to repay his debts in good faith. The Debtor claims that based on his current and historical income and expenses, he is unable to maintain a "minimal" standard of living if forced to repay his loans. Based on the foregoing, it is the Debtor's contention that his long term struggle with mental illness and history of failed ventures coupled with his inability to get or keep significant employment, prevents him from maintaining even the minimal standard of living.

On January 13, 2006, ECMC filed its Answer and set forth general admissions and denials (Doc. No. 5). Coupled with its Answer, ECMC asserted three affirmative defenses. However, it should be noted at the outset, that the only affirmative defense asserted by ECMC which qualifies as an affirmative defense is that the Debtor failed to make a good faith effort to repay his education loans to the Defendant.

On April 6, 2006, the Defendant, FDOE also set forth in their Answer general admissions and denials. As a defense, FDOE asserts that the Debtor s Complaint fails to state a claim for which relief may be granted since the ultimate facts do not show that the Debtor will suffer undue hardship if the student loans are not discharged. Furthermore, FDOE asserts

that the Debtor's Complaint does not allege that the Debtor made a good faith effort to repay his loans.

The Court notes that the holders of the student loans did not file their respective proofs of claims for this Court's consideration, that is, to consider the dischargeability, *vel non*, of the student loan debts owed to them by the Debtor. However, it is the Debtor himself who seeks from this Court the determination of the issue and, therefore, the failure to file a proof of claim will not prevent this Court from considering the dischargeability, *vel non*, of the student loan claims involved in this case.

### Historical Events Relevant to Issue Under Consideration

The record reveals that the Debtor was incarcerated several times as a juvenile. The Debtor participated in four juvenile programs and had a history of anti-social behavior. The Debtor alleges that he was abused as a child by his step-father and was thrown out of his family's home at the age of 14. The Debtor was incarcerated for felonies on two occasions at ages 18 and 19. The Debtor was convicted of arson and burglary and sentenced to five years as a young adult. Upon his entry into adult state prison in January 1992, the Debtor was assessed psychologically. The Department of Corrections (DOC) determined that the Debtor showed no significant mental health problems, had "[n]o history of mental disorder and [his] current mental status was [within normal limits];" and, therefore, the Debtor had "[n]o need for mental health services at [that] time." (DOE Exhibit 8, 1/28/92, p. 71). The Debtor was released on Community Control in April 1992. The Debtor violated the terms of his release and was reincarcerated from January to May, 1993. (FEH Transcript, 9–12, p. 15).

Prior to entering the correctional institution, the Debtor was evaluated and treated by numerous mental health providers at the South Florida Reception Center. At his initial entry into the reception center in 1993, the Debtor reported to the DOC's Psychology Department interviewer that he had been on Thorazine during his prior prison term. However, on or about January 15, 1993, nine days later, the Debtor told Br. Badilla, the prison psychiatrist, that he had not been prescribed medication at the jail, but thought he needed it. The Debtor was evaluated by Dr. Badilla, and the doctor diagnosed the Debtor with dysthymic disorder. Dysthymic disorder is a conduct disorder which is like a mild type of depression. Dr. Badilla prescribed the Debtor Mellaril "for impulse control and anger" and classified him as an S III. (DOE Exhibit 8, 1–15–93 pp. 112, 113). Being classified as an S III means that the institution to which an inmate could be transferred is restricted to those institutions that have psychiatric care available. (Plaintiff's DOC Records, Exhibit 128).

On January 19, 1993, the Debtor refused to take the medication prescribed by the doctor. The Debtor stated that "I'm okay, I don't need it." (DOE Exhibit 10, pp. 22–23; DOE Exhibit 8, 1–19–93, p. 38). On the same date, the Debtor signed a statement of refusal. On January 22, 1993, the Debtor was evaluated by an outpatient psychiatrist. The Debtor related to the doctor that he felt fine (DOE Exhibit 8, 1–22–93 p. 107), and based on the same, the doctor changed the Debtor's classification to S II. The doctor noted that the Debtor "realized that he does not need [treatment] and is capable of independent and proper behavior." *Id.* During the same time, the Debtor stated that he was not crazy and signed a refusal of Mental Health services. (DOE Exhibit 8, 1–22–93 p. 123).

On February 2, 1993, the Debtor was evaluated by Dr. Janice Ellery, then a

DOC Psychology Specialist. Dr. Ellery determined that the Debtor was suffering from temporary adjustment problems and also had some anger issues. (DOE Exhibit 10, 1–7, p. 25). While going through her psychological screening of the Debtor, the Debtor stated to Dr. Ellery that he didn't have any problems and wanted his psychological grade to be changed from an F2 to an F1. (DOE Exhibit 10, 23–24, p. 25). Being classified as an F1 indicates that the inmate has no mental health issues. Dr. Ellery noted that the Debtor stated to her that if he got on the medication it would assist him in qualifying for Social Security Income. (DOE Exhibit 10, 22–24, p. 26). Dr. Ellery also quoted the Debtor stating, "I thought it would make it easier, but it backfired on me." (DOE Exhibit 10, 25, p. 26 and 1, p. 27).

On February 9, 1993, the Debtor was again evaluated by Dr. Ellery during a group session. Dr. Ellery noted on the individual therapy note that the Debtor denied any suicidal and/or homicidal ideations. (DOE Exhibit 10, 1–8, p. 28). Dr. Ellery found the Debtor to be stable and had made a good institutional adjustment. (DOE Exhibit 10, 22, p. 28). On February 16, 1993, Dr. Ellery again evaluated the Debtor and noted that he showed no evidence of psychosis, he was stable and that the Debtor denied suicidal, homicidal ideation. (DOE Exhibit 10, 16–18, p. 30). On February 23, 1993, Dr. Ellery noted that the Debtor was bothered by his thoughts of wanting to go back to his prior criminal behavior. Dr. Ellery further indicated that the Debtor denied suicidal, homicidal ideations and was able to recognize his own irrational thought process. (DOE Exhibit 10, 1–19, p. 31).

On March 2, 1993, Dr. Ellery met with the Debtor and indicated that he reported to her that he was doing okay and he should be hearing about his controlled re-lease. In her individual therapy note, Dr. Ellery quoted the Debtor saying, "I'm really straight. I just faked everyone out when I first came in. I was scared of doing time because I looked like a kid." (DOE Exhibit 10, 10–21, p. 33). Dr. Ellery concluded that the Debtor was "very manipulative and verbally bright." (DOE Exhibit 10, p. 33; DOE Exhibit 8, 3/2/93, p. 98). The Debtor was then transferred to Hamilton Correction Institute (HCI).

Upon his arrival at HCI, the Debtor submitted an inmate request form. The Debtor stated that "I was attending mental health at South Florida Reception Center. I need to talk to a therapist to discuss my further treatment or refusal of such." (DOE Exhibit 10, 13 –19, p. 34). Based on the Debtor's request, the psychologist scheduled an initial session with the Debtor on April 5, 1993. (DOE Exhibit 10, 19–21, p. 34).

On April 2, 1993, there was a psychological screening of the Debtor done by the psychologist at HCI. The psychologist noted that the Debtor had "no dysthymic symptom" at the time of the evaluation. (DOE Exhibit 10, 11–12, p. 36). Based on his evaluation, the psychologist changed the Debtors F grade to an F1. Therefore, the psychologist determined that the Debtor was "very pleasant, good contact, has good line ... no depression noted" (DOE Exhibit 8, 5–11, pp. 93 and 94) and, therefore, the psychologist concluded that the Debtor was no longer in need of any regular mental treatments and/or follow-up. The Debtor was released from HCI sometime in May 1993.

The record is devoid of any information regarding the Debtor's medical, mental or social behavior from June 1993 through 2003.

However, the record does reflect that the Debtor was under the care of Dr. Henri Hall, a psychiatrist of the Compass

Health Group and Carlo Liggio, a nurse practitioner (Liggio), with the same group. It was Liggio who referred the Debtor to Dr. Scott Segal, a psychiatrist (Dr. Segal). The Debtor's initial visit with Dr. Segal lasted approximately one hour. At the initial visit Dr. Segal performed a mental status exam which consists of observation, mood questions, and hallucinations of the thought content, thought process, and calculation ability. (Plaintiff's Segal Depo., 15–24, p. 23). Dr. Segal did not perform standardized test. Dr. Segal did not consult with Dr. Hall or Liggio, rather he referred to the medical reports provided to him by the Debtor. Dr. Segal simply relied on the Debtor's descriptions of his symptoms and, based on the same, the Debtor received medication under the supervision of Dr. Segal for the first time beginning October 23, 2006. (Plaintiff's Segal Depo., 17–22, p. 8). Dr. Segal prescribed the Debtor Zoloft, Risperdal, Xanax and Adderall. The Debtor is also prescribed Viagra since the antidepressants may cause sexual dysfunction. The Debtor remains under the supervision of Dr. Segal. (FEH Transcript, 4–15, p. 21).

### Relevant Activity of the Debtor During the Relevant Time

In 2005, the Debtor was an over-the-road truck driver. The Debtor drove cross county for a company located in Naples, Florida. When his employer became aware of the Debtor's criminal background especially, his felony conviction, the Debtor was discharged. The Debtor then obtained employment as a chef at the Grills of Naples. Due to a dispute with a fellow employee, the Debtor was demoted and his salary was decreased approximately one-half of his prior hourly income.

The Debtor then attempted to obtain employment with a moving company driving a truck. The Debtor no longer attempted to obtain a position with a restaurant with respect to obtaining a position as a chef. The Debtor claims that he has difficulty relating to other people and trouble dealing with authority and, therefore, driving a truck was the best position for him.

During his time of employment, the Debtor claims that he made various payments on some of his student loans. However, the Debtor failed to provide this Court with any evidence as to the amounts he paid to each lender.

It is without dispute that the Debtor was offered to participate in the Ford Program Income Contingent Repayment Plan (Ford Program). The Debtor failed to take advantage of the Ford Program. Under the Ford Program, the Debtor would not be required to pay anything on his student loans for as long as his Adjusted Gross Income is no more than the poverty level and 20% of any amount over that, during which time he would be deemed to be current on his loan payments. Any balance remaining after 25 years is forgiven. The Debtor stated that he did not want to go into the Income Contingent Repayments Plan because he did not want to endure "25 years of being under scrutiny and supervision." (FEH Transcript, 17, p. 33 and 6–12, p. 34).

The record reveals in October, 1994, sometime after the Debtor got out of prison, he purchased a home for $28,000. Four years later the Debtor sold the same home for $78,000. In 2003, the Debtor purchased his second home in the amount of $110,000. The record is unclear as to the amount the Debtor received when he sold his second home.

In 1998, the Debtor obtained a drivers license which permits him to drive, double-triple trailers. The Debtor also took his real estate license examination and past it. Although, the Debtor's real estate license is not in active status, the Debtor could

reactive his status with the Real Estate Board. The Debtor was also involved in a carpet cleaning business. Due to the Debtor's failure to maintain his payments on the equipment, the equipment was repossessed. The record reveals that the Debtor drove a truck to California and Los Vegas however, the Debtor denies having driven the truck to Mexico.

However, despite the Debtor's denial of having driven into to Mexico, the Debtor's bank statements indicate that the Debtor made several purchases and bank withdrawals in Juarez, Mexico' during the months of April, June and July, 2005. In June, 2005, the Debtor also purchased two airline tickets, each in the amount of $222.90. In addition to the above, the Debtor also purchased products for his wireless computer products and/or services in the amount of $159 and $22.49.

In August, 2005, the Debtor spent $64 at a Los Angeles restaurant, $59.90 for Stratosphere tickets in Las Vegas, $48 at a Hallandale restaurant and $97 at a North Miami hotel and $60 at a restaurant in Hollywood, Florida in September, 2005. In December, 2005, the Debtor made two withdrawals at SeaEscape for $105 and $205. In January, 2006, the Debtor spent $22.84 at Blockbuster Video. From June, 2005 through February, 2006, the Debtor on fourteen occasions spent $19.95 at the adult video rental stores. The record is clear that the Debtor's cell phone bills show that he Debtor paid T Mobile $150 in April 2004, $199 in May, $208 in June, $302 in August, $316 in September and $270 in October, 2005.

The record does reflect that the Debtor's adjusted gross income reported on his U.S. Tax returns was $6,071 in 2005; $5,790 in 2004; $5,277 in 2003; $3,800 in 2002 and $7,872 in 2001. The Debtor currently receives the sum of $530 per month SSI income. The Debtor pays $490.00 in rent, $75 in electricity and $70 in phone. The Debtor spends approximately $200 per month in medical expenses.

The record reveals that the only reason the Debtor filed bankruptcy was to have these student loans discharged. The Debtor stated that unless the student loans were discharged he would never be able to afford a house.

**Conclusions of Law**

Section 523(a)(8) was enacted by Congress amid reports that students were abusing the fresh start policy of the Bankruptcy Code by filing bankruptcy and then seeking discharge of their student loans after graduation. *In re McLeroy,* 250 B.R. 872, 878 (N.D.Tex.2000). Subsection 8 of Section 523 of the Bankruptcy Code was added "in order to protect the United States Treasury, as well as to protect the solvency of the guaranteed student loan program." *Id.* The Bankruptcy Code does not define the term "undue hardship" however various courts have adopted the standards set forth in the case of *Brunner v. New York State Higher Education Services Corp.,* 831 F.2d 395, 396 (2d Cir. 1987). *See In re Cox,* 338 F.3d 1238, 1241 (11th Cir.2003).

To establish undue hardship, the Brunner standard requires the debtor to prove by a preponderance of the evidence:

(1) that the debtor cannot maintain, based on current income and expense, a "minimal" standard of living for herself and her dependants if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

831 F.2d at 396.

The first prong of the Brunner test requires a "minimal standard of liv-

ing" is not such that debtors must live a life of poverty, but it does require "more than showing of tight finances." *In re Faish*, 72 F.3d 298, 306 (3d Cir.1995). The court in the case of *In re McLaney*, 314 B.R. 228, 234 (Bankr.M.D.Ala.2004), noted that "a minimal standard of living lies somewhere between poverty and mere difficulty." The court in the case of *In re Douglas*, 366 B.R. 241 (Bankr.M.D.Ga. 2007), stated that a court in making a determination of whether a debtor's disposable income, determined as the difference between his monthly income and his reasonable and necessary monthly expenses, with his monthly payment necessary to repay his student loans would enable a debtor to maintain a minimal standard of living.

The *Douglas* court noted that a court in making such a determination:

must apply its common sense knowledge gained from ordinary observations in daily life and general experience to determine whether [a debtor's] expenses are reasonable and necessary. If [the debtor] expends funds for items not necessary for the maintenance of a minimal standard of living of if [the debtor] expends too much for an item that is needed to maintain that minimal standard, then it is unlikely that, given [the debtor's] present circumstances, the first prong of the *Brunners* test is satisfied where such overpayment would permit [the debtor] to cover the expense of her student loan debt without sacrificing a minimal standard of living . . .

*Douglas*, 366 B.R. at 253–254 (footnote omitted).

■ As noted earlier, the Debtor purchased two homes and sold both of them; he had a drivers license to drive an over-the-road truck; he had a real estate license which could be reactivated—however, most importantly, the record reveals

that in addition to the surplus from the sale of his homes, the Debtor spent funds that were not necessary to maintain a minimal standard or living. Therefore, this Court is constrained to reject the Debtor's contention that he is unable to maintain the minimal standard of living. While it is true that the Debtor is currently unemployed and lives on SSI, his medical condition does not warrant the conclusion that he is unable to obtain some form of employment in order to make minimal payments on some of his student loans.

Considering the first prong of the Brunner test, this Court is satisfied that the most that can be said with respect to the evidence presented to this Court is that, the evidence provided by the Debtor and the Defendants are both on equal balance. Thus, the Debtor has failed to carry the burden to establish the elements necessary by the preponderance of the evidence and, therefore, his claim of dischargeability on this count is deemed to be rejected.

■ The second prong of the Brunner test, "the inability to pay must be 'likely to continue for a significant of time,' such that there is a 'certainty of hopelessness' that the debtor will be able to repay the loans within the repayment period." *Mosley*, 494 F.3d 1320, 1326. DOE argues that the Debtor did not provide this Court with evidence through Dr. Segal, or otherwise, of what his long-term prognosis is, or that he will be unable to obtain employment for the next 25 to 30 years. This Court concludes that the Debtor's testimony does not meet the standard of "likely to continue for a significant time." *Cox*, 338 F.3d at 1242.

The Debtor's current medical condition is susceptible "to fabrication, exaggeration and fraud." *In re Burton*, 339 B.R. 856, 874–75 (Bankr.D.Va.2006). The Debtor himself as noted above faked his mental

health issues from the beginning of his second term in prison. The Debtor testified that it is difficult to hold a job. He testified that he is unable to obtain or maintain significant employments based on his criminal record. The Debtor further stated that he is not able to get along well with others and has anger control issues. Furthermore, the Debtor testified that the only way to get employment is not to be 100% truthful on his employment application. However, this Court is satisfied that the Debtor failed to provide sufficient evidence to support a finding that there the Debtor will not be able to improve financially in the future. Furthermore, taking into consideration the Debtor's age, coupled with his possibility of improving his chances of increasing his earnings potential in the future, it is this Court's determination that it is highly likely that the Debtor will be able to repay his loans.

■■■■ The third prong of the *Brunner* test requires for the debtor to have made good faith efforts to repay the loans. *Cox,* 338 F.3d at 1241. The DOE primarily argues that the Debtor has failed to meet his burden of showing his good faith efforts to repay his loans. Good faith efforts "is measured by the Debtor's efforts to obtain employment, maximize income, and minimize expenses." *Educ. Credit Mgmt. Corp. v. Mason,* 464 F.3d 878, 884 (9th Cir.2006). However, a debtor's "failure to make a payment, standing alone does not establish a lack of good faith." *Mosley,* 494 F.3d 1320, 1326 (quoting *Educ. Credit Mgmt. Corp. v. Polleys,* 356 F.3d 1302, 1311 (10th Cir.2004)). "Good faith is measured by the debtor's efforts to obtain employment, maximize income, and minimize expenses; his default should result, not from his choices, but from factors beyond reasonable control." *Id.*

■■■■ The record and evidence presented to this Court strongly indicates that the Debtor has not made a good faith effort to repay his loans. While it is true that the Debtor made an attempt at one time to repay at least a portion of his student loans, he has failed to make a good faith effort to continue paying the lenders. As stated above, the Debtor was given the opportunity to participate in the Ford Program, which would have eliminated the requirement to have to repay any of these loans so long as his annual income was below the poverty level.

The Debtor claims he is unable to support himself without significant assistance from his family. (FEH Transcript, 25, p. 8). However, the record shows that the Debtor had sufficient money to travel to California, Los Angeles and Mexico. The Debtor spent excessive amounts of money on recreation and eating in restaurants instead of repaying his loans. Based on the foregoing, this Court is satisfied that the Debtor did not make a good faith effort to repay his student loans.

Based on the foregoing, this Court is satisfied that the Debtor failed to satisfy each of the three prongs of the *Brunner* test by the preponderance of the evidence. Furthermore, the Debtor has not proven that his student loans will impose an undue burden upon him and, therefore, the loans referenced to above shall remain exempted from discharge.

In summary, this Court is satisfied that the Debtor failed to establish by the preponderance of the evidence that the student loans are within the exceptions set forth pursuant to Section 523(a)(8) of the Bankruptcy Code.

A separate final judgment shall be entered in accordance with the foregoing.

A separate final judgment shall be entered by default against Nelnet LNS, Perimeter Credit LLC, and Windham Professionals, Inc.

492

## FINAL JUDGMENT

This cause came on for consideration on the Court's own Motion for entry of a Final Judgment in the above-captioned adversary proceeding. The Court has examined the record and finds that it has entered its Findings of Fact, Conclusion of Law, and Memorandum Opinion. It is therefore appropriate to enter Final Judgment.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that Final Judgment be, and the same is hereby, entered in favor of the Defendants, Florida Department of Education and Educational Credit Management Corporation and against the Debtor/Plaintiff, Justin Chasser.

## FINAL JUDGMENT

This cause came on for consideration on the Court's own Motion for entry of a Final Judgment in the above-captioned adversary proceeding. The Court has examined the record and finds that the Clerk of Court entered a default against NelNet, LNS, Perimeter Credit, LLC and Windham Professionals, Inc. It is therefore appropriate to enter Final Judgment.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that Final Judgment be, and the same is hereby, entered against NelNet, LNS, Perimeter Credit, LLC and Windham Professionals, Inc.